896 A.2d 459

RAMAPO RIVER RESERVE HOMEOWNERS ASSOCIATION, INC., PLAINTIFF, v. BOROUGH OF OAKLAND, A MUNICIPAL CORPORATION, DEFENDANT AND THIRD PARTY PLAINTIFFAPPELLANT, v. BAKER RESIDENTIAL, LP, THIRD PARTY DEFENDANT–RESPONDENT.

Argued November 29, 2005—Decided March 13, 2006.

---

440

*Brian M. Chewcaskie* argued the cause for appellant (*Gittleman, Muhlstock & Chewcaskie*, attorneys).

*Lawrence H. Wertheim* argued the cause for respondent (*Himelman, Wertheim & Geller*, attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

This appeal requires that we harmonize, as a matter of public policy, the provisions of the Municipal Land Use Law, *N.J.S.A.* 40:55D–1 to –99, governing municipal development agreements— "written agreement[s] between a municipality and a developer relating to the planned development[,]" *N.J.S.A.* 40:55D–45.2*l.*— with the obligation set forth in the Municipal Services Act requiring that a municipality either provide or reimburse the cost of certain enumerated services to a statutorily defined "qualified private community[,]" *N.J.S.A.* 40:67–23.2e and –23.3. On the strength of *Briarglen II Condo. Ass'n, Inc. v. Twp. of Freehold,* 330 *N.J.Super.* 345, 749 *A.*2d 881 (App.Div.2000) (*Briarglen II* ), both the trial court and the Appellate Division held that the public policy against double-charging residents of a planned development for certain municipal services, once through real estate taxes and again through assessments from the homeowners' association, is non-delegable and trumps the provisions of any development agreement between the municipality and the developer.

We hold that a reading of the relevant provisions of the Municipal Land Use Law and the Municipal Services Act in pari materia requires an outcome different from the one reached below. As a threshold matter, we hold that there is nothing in either the Municipal Land Use Law or the Municipal Services Act that prohibits a limited bargained-for delegation of a municipality's obligations to a developer. Specifically, we hold that, under a properly adopted development agreement as provided in the Municipal Land Use Law, a municipality may delegate its statutory obligations under *N.J.S.A.* 40:67-23.3 until such time as the developer's control of the executive board of a homeowners association established pursuant to the Planned Real Estate Development Full Disclosure Act, *N.J.S.A.* 45:22A-21 to -56, terminates.

## I.

Pursuant to the provisions of the Municipal Land Use Law, *N.J.S.A.* 40:55D-45.2*l*, on October 2, 1996, the Borough of Oakland (Borough) and Baker Residential, LP (Baker)[1] entered into a written development agreement for the development of Ramapo River Reserve, a planned residential development consisting of three hundred seventy-five townhouses and single-family homes, and additional common open space, all located within the Borough in Bergen County, New Jersey. As is customary in such development agreements, Paragraph 34 of the development agreement required that Baker "dedicate to the public use ... all roads, easements, the two well sites, and rights-of-way" within the development by "deliver[ing] to the [Borough] a deed, free and clear of all liens and encumbrances and conditions...." However, that same paragraph made clear that "[n]otwithstanding anything to the contrary, no obligation is imposed on the Borough to accept

---

[1] Although the pleadings in this case refer to Baker both with the designation reserved for, and explicitly as, a limited partnership, the text of the development agreement and its notarized acknowledgment identify Baker as a "Connecticut general partnership." This factual anomaly, however, ultimately has no effect on the outcome of this case.

any new streets, easements, rights-of-way, playgrounds or other areas shown on the subdivision plans, site plans and/or other drawings referred to herein." Moreover, Paragraph 34(a) set forth a specific limitation on each party's obligations until such dedication was completed in its entirety:

> Until such time as [Baker] has completed all of the public improvements, including roadways, and the Borough has accepted the same by formal Resolution, [Baker] shall be responsible to maintain said roads and keep same free of all snow and other debris so as to give access to fire and other emergency and police vehicles which may render assistance with said subdivision and/or site. Notwithstanding anything to the contrary, no obligation is imposed on the Borough to accept any street shown on the subdivision plans, site plans and/or other drawings referred to herein.

Further, under Paragraph 16 of the development agreement, Baker covenanted that it

> shall be and remain liable for any and all damage or money loss (including but not limited to attorney's fees) occasioned to the Borough or the [Planning] Board or their officers or agents by any neglect, wrongdoing, omission or commission of any act by [Baker] . . . arising from the making of the improvements, the performance of the terms hereof or from or out of this [development agreement]. [Baker] shall also defend, save, indemnify and hold harmless the Borough, its officers, agents, boards and employees from any and all claims, actions at law or in equity, charges, debts, liens, encumbrances, costs and counsel fees which may arise from any such damage or loss, from the making of the improvements, the performance of the terms hereof or from or out of this [development agreement], except where the Borough or its agents have been judicially determined to have acted contrary to law or failed to perform acts required by law or by this [development agreement] or have been guilty of negligence.

It is the interplay of these two latter provisions, and their relationship to both the Municipal Land Use Law and the Municipal Services Act, that lies at the core of this appeal.

As provided in the development agreement, Baker developed Ramapo River Reserve, a "qualified private community" under the Municipal Services Act,[2] and residents began occupying its town-

---

2 In relevant part, *N.J.S.A.* 40:67–23.2e defines a "qualified private community" as "a residential condominium, cooperative, fee simple community, or horizontal property regime, the residents of which do not receive any tax abatement or tax exemption related to its construction, comprised of a community trust or other trust device, condominium association, homeowners' association, or council of coowners, wherein the cost of maintaining roads and streets

homes and single-family homes. As an initial part of that development, on December 4, 1997, Baker caused to be filed with the Office of the Clerk of Bergen County, New Jersey a "Declaration of Restrictive and Protective Covenant (sic), Easements, Conditions, Charges and Liens," which, in turn, created the Ramapo River Reserve Homeowners Association, Inc. (Homeowners Association).[3] The purpose of the Homeowners Association was to "promote the health, safety and welfare of the owners and residents therein, and to administer, operate and manage the common property." Among the services provided by the Homeowners Association were snow and ice removal from the roadways within Ramapo River Reserve. The Homeowners Association is funded by, and paid for these services from, assessments made against the residents of Ramapo River Reserve.

At the outset, as is the case in all such developments, the Homeowners Association was controlled by its developer, Baker. Although the record does not disclose when Baker's control over the Homeowners Association terminated, the Planned Real Estate Development Full Disclosure Act provides that

[i]rrespective of the time set for developer control of the association provided in the master deed, declaration of covenants and restrictions, or other instruments of creation, control of the association shall be surrendered to the owners in the following manner:

(1) Sixty days after conveyance of 25 percent of the lots, parcels, units or interests, not fewer than 25 percent of the members of the executive board shall be elected by the owners.

(2) Sixty days after conveyance of 50 percent of the lots, parcels, units or interests, not fewer than 40 percent of the members of the executive board shall be elected by the owners.

(3) Sixty days after conveyance of 75 percent of the lots, parcels, units or interests, the developer's control of the executive board shall terminate, at which time the owners shall elect the entire executive board; except that the developer

and providing essential services is paid for by a not-for-profit entity consisting exclusively of unit owners within the community."

[3] Neither the Borough nor Baker disputes that the Homeowners Association qualifies as "qualified private community."

may retain the selection of one executive board member so long as there are any units remaining unsold in the regular course of business.
[*N.J.S.A.* 45:22A–47a. *See also N.J.A.C.* 5:26–8.4(a).]

On April 15, 2002, the Homeowners Association filed a complaint in lieu of prerogative writs against the Borough, alleging that (1) the Homeowners Association is a "qualified private community" under the Municipal Services Act; (2) the Borough provides snow and ice removal to all residents of the Borough save for the residents of Ramapo River Reserve; and (3) the Borough is required to either provide such services to, or reimburse the cost of such services to, Ramapo River Reserve. The Borough's response was two-fold. First, the Borough answered and asserted several affirmative defenses to the Homeowners Association's complaint, alleging that it was not liable to the Homeowners Association as a matter of law. Second, pursuant to *Rule* 4:8–1, the Borough filed a third-party complaint against Baker seeking to invoke the provisions of the development agreement and asserting that, "[w]hile the case of [*Briarglen II* ] prohibits the municipality from avoiding its obligation to reimburse the [Homeowners Association] for certain services during construction, the holding in that case does not prohibit the [Borough] from seeking compensation from [Baker], pursuant to a valid agreement by and between [them]." Baker denied any such obligation.

The Homeowners Association sought partial summary judgment against the Borough and, by an order dated April 4, 2003, the trial court held that the Borough's

failure and refusal to either provide snow/ice removal services to the [Homeowners] Association's residents or reimburse the [Homeowners] Association for its costs not to exceed the amount which the [Borough] would have expended on that service if it were provided directly by the [Borough] to [the Homeowners Association] incurred to provide those services to its residents itself constituted, and continues to constitute, a violation of the [Municipal Services] Act.

Neither the Borough nor Baker challenged that holding. Instead, the Borough filed its own motion for partial summary judgment seeking (1) a declaration that the provisions of Paragraph 34(a) of the development agreement "as it concerns street maintenance, is valid and enforceable;" (2) a declaration that Baker is responsible

for all damages due from the Borough to the Homeowners Association; and (3) indemnity for the Borough's fees, costs and expenses under Paragraph 16 of the development agreement. By way of response, Baker filed a cross-motion for summary judgment, seeking dismissal of the third-party complaint. The issues were thus joined for resolution.

On May 9, 2003, the trial court heard argument on the Borough's motion for summary judgment and Baker's cross-motion for summary judgment. Denying the Borough's motion for summary judgment and granting Baker's cross-motion for summary judgment, the trial court held that

the economic reality of the [Borough's] contractual right to shift the reimbursement to [Baker] would result in the residents of the qualified private communities ... paying double for services. There is no perfect mathematical doubling, suffice it to say that it belies common sense that [Baker] does not pass on in the price of the unit, if not in perhaps the budget of the initial associations, the projected cost over a reasonable period of time of the street cleaning services. I don't see that today's case is at its core any different than [Briarglen II]. I think the principles of law and I think the logic, and I think the economics of this situation are substantially the same, if not exactly the same. It's clearly not identical, but it's as close as you can come.

Addressing *Briarglen II* directly, the trial court observed:

I don't believe that the declaration of rights of the developers and municipalities in [Briarglen II] is mere dicta. Now it may not necessarily have been necessary for the determination, but it [is] such a forthright statement of law, that [it] is one that I only [at] my peril can disregard. And even if I were to disagree with it, I will not disobey it. I think the force of logic, the force of common sense, the force of this jurisprudence, leads me to the conclusion that [Baker] has it more correct on this issue than the [Borough]. And having said that, there are some aspects of unfairness in that. That unfairness, however, being obviated by the overarching public policy of this state expressed by the Legislature. Municipalities, being creatures of the Legislature, don't have the same freedom of contract as others might have, and are bound to and beholden to changes in the law such as this and, of course, we know the Statute is constitutional.

In an unreported decision, the Appellate Division affirmed. Starting from the proposition that "a failure to provide municipal services equally to all citizens denies equal protection of the law," the panel reaffirmed the holding of *Briarglen II* that "[t]he legislative intent of the [Municipal Services] Act was to help eliminate double payment for some services which the residents of

qualified private communities now pay through property taxes and fees to their association." *Briarglen II, supra,* 330 *N.J.Super.* at 353, 749 *A.*2d 881 (citations and internal quotation marks omitted). The Appellate Division then considered whether a municipality is permitted to delegate to a developer the municipality's statutory obligation to provide road snow and ice removal. Conceding that "the statute does not expressly prohibit a municipality from delegating its duties thereunder," the panel again cited *Briarglen II* to the effect that

> [t]he legislative purpose would be frustrated if municipalities were permitted to contract away their statutory duty to either provide or reimburse qualified private communities for the enumerated services. If municipalities were permitted to do so, the result would be that the residents of qualified private communities would be paying double for services, that is, through property taxes and fees to their association. It is just such a result that the [Municipal Services] Act seeks to avoid.
>
> [*Id.* at 356, 749 *A.*2d 881.]

We granted the Borough's petition for certification, 183 *N.J.* 592, 874 *A.*2d 1109 (2005), and, for the reasons that follow, we reverse the judgment of the Appellate Division and remand the cause to the trial court for further proceedings consistent with this opinion.

## II.

Before us, the parties' positions remain unchanged: the Borough argues that *Briarglen II* does not prohibit the type of contractual cost-shifting present here, while Baker urges that *Briarglen II* flatly proscribes any such delegation.[4] Therefore, we are called to examine the holdings of *Briarglen II* in detail.

---

[4] After argument, the parties were requested to submit supplemental briefs on the following question:

What effect, if any, does Section 5 of the New Jersey Planned Real Estate Development Full Disclosure Act, *N.J.S.A.* 45:22A–47, have on whether and to what extent a municipality, consistent with public policy, may delegate the provision of statutorily required municipal services under the Municipal Services Act, *N.J.S.A.* 40:67–23.3, to a developer pursuant to a written

### A.

*Briarglen II* stands for two separate propositions. First, *Briarglen II* holds that, because the residents of a "qualified private community" under *N.J.S.A.* 40:67–23.2e pay real estate taxes to their municipality, *N.J.S.A.* 40:67–23.3 entitles them to the statutorily enumerated municipal services, by the municipality either performing the services itself or reimbursing the costs of such services to the "qualified private community." Because the proposition that a resident of a "qualified private community" should not be subject to the equivalent of double taxation, once by the municipality and again by the homeowners association, is self-evident, we agree with that holding.

However, to the extent that *Briarglen II* adopts a blanket prohibition against a municipality delegating any of its service obligations under *N.J.S.A.* 40:67–23.3 to a developer pursuant to a valid development agreement entered into pursuant to the Municipal Land Use Law, it is too broad. We agree that, at one extreme, a municipality cannot in perpetuity delegate its statutorily imposed service obligations to a developer. By the same token, we recognize, as the trial court did here, that before any units in a "qualified private community" are sold, the developer is paying real estate taxes at the same rate it did before any improvements to the realty were made and, hence, it is inequitable to transfer the cost of statutorily imposed municipal services obligations to the municipality without a concomitant increase in municipal revenues.

The problem here lies in the middle: the period between the time when some, but not all, of the units have been sold, and the time when enough units have been sold so as to generate sufficient

development agreement under the Municipal Land Use Law, *N.J.S.A.* 40:55D–45.2l?

In their supplemental submissions, both the Borough and Baker argued that the Planned Real Estate Development Full Disclosure Act has no effect on the Municipal Services Act. As noted below, *infra,* 186 *N.J.* at 452–54, 896 *A.2d* 468–69 (2006), we reach a different conclusion.

tax revenues to cover the costs of the municipally-provided services. During that period, their respective real estate tax assessments have increased, but those tax revenues well may be insufficient to cover the costs of roadway snow and ice removal. The Appellate Division did not focus on that interim period when, in *Briarglen II*, it adopted a blanket prohibition against delegation to a developer of duties of the municipality imposed by the Municipal Services Act. This case presents a context for consideration of the broad holding of *Briarglen II*.

 We are guided by standard principles of statutory construction:

> The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language. We ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole. It is not the function of this Court to rewrite a plainly-written enactment of the Legislature [ ] or [to] presume that the Legislature intended something other than that expressed by way of the plain language. We cannot write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment, or engage in conjecture or surmise which will circumvent the plain meaning of the act. Our duty is to construe and apply the statute as enacted.
>
> A court should not resort to extrinsic interpretive aids when the statutory language is clear and unambiguous, and susceptible to only one interpretation.... On the other hand, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction. We may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language. [*DiProspero v. Penn*, 183 *N.J.* 477, 492–93, 874 *A.2d* 1039 (2005) (citations and internal quotation marks omitted).]

When, as here, we are called to harmonize separate statutory provisions, our task is clear:

> When reviewing two separate enactments, the Court has an affirmative duty to reconcile them, so as to give effect to both expressions of the lawmakers' will. In other words, it is our obligation to make every effort to harmonize separate statutes, even if they are in apparent conflict, insofar as we are able to do so.....
>
> Statutes that deal with the same matter or subject should be read in pari materia and construed together as a "unitary and harmonious whole."
>
> [*St. Peter's Univ. Hosp. v. Lacy*, 185 *N.J.* 1, 14–15, 878 *A.2d* 829 (2005) (citing *In re Adoption of a Child by W.P. and M.P.*, 163 *N.J.* 158, 182–83, 748 *A.2d* 515 (2000) (Poritz, C.J., dissenting) (citations and footnote omitted)).]

We must, then, harmonize two statutory provisions the trial court and the Appellate Division viewed as in an irreconcilable conflict: the mandate of the Municipal Services Act, *N.J.S.A.* 40:67–23.3, requiring that a municipality provide or pay for a qualified private community's roadway snow and ice removal, and the provision in the Municipal Land Use Law, *N.J.S.A.* 40:55D–45.2*l*, permitting a written development agreement between a municipality and a developer "relating to the planned development."

### B.

We return to the evil the Legislature sought to eradicate by enacting *N.J.S.A.* 40:67–23.3, that is, "to 'help eliminate double payment for some services which the residents of qualified private communities now pay through property taxes and fees to their association.' " *Briarglen II, supra,* 330 *N.J.Super.* at 353, 749 *A.*2d 881 (citing *Legislative Fiscal Estimate Statement to S. 2869* (April 18, 1989)). Conversely, if the residents of the "qualified private community" are paying only once for the statutorily mandated municipal services, be it to their homeowners association by way of fees or to their municipality in the form of property taxes, then the proscription applied by the Appellate Division is inapplicable. The difficulty, again, lies in determining when the burden shifts along this continuum: starting with the payment of property taxes on unimproved realty; followed by the provision of increased municipal services but still without an increase in property taxes; then followed by the provision of increased municipal services without full coverage of the municipality's costs but with the residents also paying for these municipal services through their association fees; and ending with the provision of increased municipal services with fully assessed and paid property taxes but with the residents also paying for the municipal services in their association fees. How one views the competing interests that arise at each of those points will determine whether and to what extent a municipality can delegate its statutory duties to a developer. At the core lie opposite but nonetheless correct concepts: a municipality should not be obliged to provide increased municipal

services in the absence of increased municipal revenues; and, conversely, a municipality that receives increased municipal revenues should provide the municipal services those revenues are intended to cover and not view those revenues, simply because of the happenstance of a development agreement, as a windfall untethered to any municipal obligation.

In *Briarglen II*, the Appellate Division set forth the proper paradigm, one that informs our understanding here:

the dictates of public policy may require invalidation of private contractual arrangements where those arrangements directly contravene express legislative policy or are inconsistent with the public interest or detrimental to the common good. Our power to declare a contractual provision void as against public policy must be exercised with caution and only in cases that are free from doubt. We must employ a balancing test, weighing the legislative policy and the public interest against the enforcement of the contractual provision, to determine whether the contractual provision at issue is void.

[*Briarglen II, supra,* 330 *N.J.Super.* at 355–56, 749 *A.*2d 881 (citations and internal quotation marks omitted).]

Applying these precepts, both the panel in *Briarglen II* and the Appellate Division below concluded that any delegation of the municipality's obligations under *N.J.S.A.* 40:67–23.3 would be void as against public policy. We reject such a broad reading of the Municipal Services Act.

█ Because it ignores the economic realities of municipalities caught in the whipsaw of lagging property tax revenues in the face of increased demand for municipal services, the Appellate Division's blanket conclusion that "[t]he legislative purpose would be frustrated if municipalities were permitted to contract away their statutory duty to either provide or reimburse qualified private communities for the enumerated services[,]" *id.* at 356, 749 *A.*2d 881, goes too far. Given the unique private yet quasi-public nature of homeowner associations, we hold that the Planned Real Estate Development Full Disclosure Act provides the proper tipping point for analysis, particularly in light of the Legislature's overarching concerns in the overlapping areas of municipal land use regulation and municipal services. As noted in the Planned Real Estate Development Full Disclosure Act, a developer must

terminate its control of the executive board of a homeowners association "[s]ixty days after conveyance of 75 percent of the lots, parcels, units or interests, . . ." *N.J.S.A.* 45:22A-47a(3).

There is a gap between the time a municipality is called upon to provide statutorily required increased municipal services and the time when property taxes catch up to cover the municipality's added costs for those services. In order to allow for a bridging of that gap, we further hold that a municipality, under the provisions of the Municipal Land Use Law, *N.J.S.A.* 40:55D-45.2*l*, and within the context of a written development agreement thereunder, may delegate to a developer the obligation to provide or pay for the municipal services enumerated in *N.J.S.A.* 40:67-23.3. However, in order to harmonize that holding with the Municipal Services Act's requirement that the municipality provide or pay for those enumerated services to "qualified private communities," we further hold that the scope of that delegation not only must be limited to the specific municipal services enumerated in *N.J.S.A.* 40:67-23.3, but also that such delegation must terminate once the developer is required to terminate its control of the executive board of the homeowners association of that "qualified private community." [5]

## C.

The application of these principles to this case remains. Here, the trial court ruled that the Homeowners Association was entitled to reimbursement from the Borough for the costs of roadway snow and ice removal. That ruling is not challenged.

---

[5] To the extent the dissent asserts that, due to the overlapping nature of his association fees and his municipal real estate taxes, there may be a period when a homeowner in a qualified private community may pay more than his fair share for certain enumerated services, we agree. The dissent, however, then concludes that the inability to ascertain with exactitude the precise moment when such overlapping assessment may occur dooms any cost-shifting. We reject such absolutism and, in the absence of legislative direction, we adopt, instead, limits on that cost-shifting so as to achieve a fair and equitable balance.

What is at issue is the contest between the Borough and Baker. In that regard, the trial court, following *Briarglen II,* ruled that the Borough had the statutory obligation to provide or pay for roadway snow and ice removal services at Ramapo River Reserve, an obligation that was non-delegable as a matter of public policy. We concur that the Borough had the statutory obligation to provide or pay for roadway snow and ice removal services to the Homeowners Association. However, because we hold that the Borough's statutory obligations under *N.J.S.A.* 40:67–23.3 are delegable until the developer must terminate its control of the executive board of the homeowners association, the Borough is still entitled to the benefit of its bargain with Baker under Paragraphs 16 and 34 of the development agreement. The summary judgment record before us does not disclose when that event occurred or, once passed, how much is owed by Baker to the Borough by way of contractual covenant and indemnity. Therefore, we remand this cause to the trial court for those determinations.

## III.

The judgment of the Appellate Division is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

Justice ALBIN, dissenting.

Today's majority decision allows municipalities to do indirectly what the Municipal Services Act, *N.J.S.A.* 40:67–23.2 and –23.3, specifically prohibits—collect real estate taxes from residents of qualified private communities without providing, or reimbursing for, such basic services as snow and ice removal and garbage and recyclable disposal. Because municipalities now will be able to evade their responsibilities under the Municipal Services Act

through the clever subterfuge of a "developer's agreement," qualified private communities again will suffer the unfair burden of double taxation: payment of real estate levies without receiving municipal services. Because I cannot conceive that the Legislature intended that result, I respectfully dissent.

Under the Municipal Services Act, a municipality must provide certain services to a qualified private community "in the same fashion as the municipality provides these services on public roads and streets," or the municipality must reimburse the qualified private community for the services. *N.J.S.A.* 40:67–23.3(a). The services referred to in the Act are "[r]emoval of snow, ice and other obstructions from the roads and streets"; "[l]ighting of the roads and streets, to the extent of payment for the electricity required"; and "[c]ollection of leaves and recyclable materials along the roads and streets and the collection or disposal of solid waste along the roads and streets." *N.J.S.A.* 40:67–23.3(a). The purpose of the Act was to "eliminate double payment for some services which the residents of qualified private communities [paid] through property taxes and fees to their association." *Sponsors' Statement to Senate Bill No. 2689*, at 3 (Apr. 18, 1989); *see also Stonehill Prop. Owners Ass'n v. Twp. of Vernon*, 312 *N.J.Super.* 68, 75, 711 *A.*2d 346 (App.Div.1998) (observing that Legislature's intent was "to relieve condominium owners of the burden of paying twice for municipal services").

In *Briarglen II Condominium Ass'n v. Township of Freehold*, the Appellate Division held that a municipality could not delegate its statutory duty to provide or reimburse for the services enumerated in *N.J.S.A.* 40:67–23.3(a) to the developer of the project. 330 *N.J.Super.* 345, 348, 749 *A.*2d 881 (App.Div.), *certif. denied*, 165 *N.J.* 489, 758 *A.*2d 648 (2000). In that case, an agreement between the municipality and the developer required the developer to clear the community's roads of snow and ice until the municipality's "final acceptance" of those roads. *Id.* at 348–49, 749 *A.*2d 881. Writing for the *Briarglen II* panel, Judge Newman observed that

[t]he legislative purpose would be frustrated if municipalities were permitted to contract away their statutory duty to either provide or reimburse qualified private communities for the enumerated services. If-municipalities were permitted to do so, the result would be that the residents of qualified private communities would be paying double for services, that is, through property taxes and fees to their association. It is just such a result that the Act seeks to avoid.

[*Id.* at 356, 749 A.2d 881.]

The *Briarglen II* court declared the contractual provision delegating a municipality's duty to provide snow and ice removal to be in direct conflict with "the express legislative policy of *N.J.S.A.* 40:67–23.3 and, thus, . . . void as against public policy." *Ibid.*

In the present case, the Borough of Oakland and Baker Residential, LP, the developer of Ramapo River Reserve, entered into an agreement similar to the one found offensive in *Briarglen II*. The Appellate Division affirmed the trial court and rejected Oakland's argument that it had a legitimate right to recoup the costs of providing snow and ice removal from the developer until the Borough by formal resolution accepted the "public improvements" required of the developer. For the same reasons expressed in *Briarglen II*, the Appellate Division found the contractual provision delegating snow and ice removal to the developer to be contrary to the legislative intent of *N.J.S.A.* 40:67–23.3(a), understanding that the developer would merely pass its costs along to the homeowners.

In reversing the Appellate Division, the majority in this case engages in a reformation of the developer's agreement to allow the municipality to delegate its obligation to provide the services enumerated in *N.J.S.A.* 40:67–23.3(a) until the developer transfers control of the homeowners' association to its members. The majority accomplishes that end by superimposing the Planned Real Estate Development Full Disclosure Act (PREDFDA), *N.J.S.A.* 45:22A–21 to –56, over the Municipal Services Act and then concluding that the developer is responsible for snow and ice removal, garbage and recyclable disposal, and street lighting until the homeowners take control of the association. Under the PREDFDA, control passes from the developer to the homeowners

when there is seventy-five percent homeownership in the community. *N.J.S.A.* 45:22A–47(a)(3).

The majority's result does not square with the statutory language or legislative history of the PREDFDA or the Municipal Services Act. Nothing in the provision of the PREDFDA relied on by the majority, which was enacted four years after passage of the Municipal Services Act, indicates that the Legislature intended to lessen a municipality's obligations to provide services to a taxpayer under the Municipal Services Act until residents in a qualified private community achieve seventy-five percent ownership and gain control of the homeowners' association.

Perhaps the only point that the parties in this case can agree upon is that the majority's interpretation of the applicable statutes is wrong. In response to a written question from this Court, both parties and amicus curiae New Jersey Builders Association (NJBA) have expressed their view that the developer's transfer of ownership to the homeowners' association is completely irrelevant to the Municipal Services Act. Amicus curiae NJBA accurately points out that the provision in the PREDFDA terminating a developer's control does not "contain any language modifying or eliminating the requirement that a municipality provide services to a qualified private community, no matter what the composition of the association board may be." The resolution achieved by the majority completely undercuts the homeowner protectionist policy that animates the Municipal Services Act.

The majority also ignores the fact that it may take years in a large subdivision before control is transferred from the developer to the homeowners. Because a developer is not an eleemosynary institution, it assuredly will pass the costs to the homeowners in the form of increased sales prices of homes. Thus, the homeowner will pay twice for municipal services, once through inflated home purchase prices and again through real estate taxes. This cannot be the result intended by the Legislature that passed the Municipal Services Act.

Moreover, we should keep in mind that a developer is unlikely to balk at a contractual provision delegating a municipality's duty to provide snow removal and garbage disposal and thereby threaten approval of a subdivision project, when that developer can simply make up the added cost by increasing the price to the home buyer. Although this case involves only snow and ice removal, the majority's decision will allow a municipality to contract away all of its duties under *N.J.S.A.* 40:67-23.3(a), including its duty to collect garbage, recyclable materials, and leaves. Thus, homeowners in qualified private communities will lose the very benefit the Legislature intended in enacting *N.J.S.A.* 40:67-23.3— basic services for their tax dollars.

Last, the majority premises its opinion on the unproven notion that the real estate taxes collected from the first tier homeowners in Ramapo Reserve and in other qualified private communities are not sufficient to cover the costs of removing snow and ice from the roadways or collecting garbage. The majority has failed to support that position by reference to the record in this case. Even if there were support in the record, the Municipal Services Act does not require the rigid formula suggested by the majority—that for each dollar of services provided to a homeowner there must be a concomitant tax dollar collected.

If the Legislature concludes that the majority has not only misconstrued its statutes but also disadvantaged the homeowners it intended to protect through the Municipal Services Act, it has the power to correct the error by a statutory amendment. The developer's agreement in this case is in direct conflict with *N.J.S.A.* 40:67-23.3 and should be declared void. I therefore dissent.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, WALLACE and RIVERA-SOTO—6.

*For dissent*—Justice ALBIN—1.