928 A.2d 102 (2007)
395 N.J. Super. 69
In the Matter of CIVIL COMMITMENT OF J.M.B., SVP-358-04.
Superior Court of New Jersey, Appellate Division.
Argued September 13, 2006.
Decided July 20, 2007.
*105 William F. Culleton, Jr., Designated Counsel, Trenton, argued the cause for appellant J.M.B. (Ronald K. Chen, Public Advocate, attorney; Mr. Culleton, of counsel and on the brief).
Lisa Marie Albano, Deputy Attorney General, argued the cause for respondent State of New Jersey (Anne Milgram, Acting Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Ms. Albano, on the brief).
Before Judges STERN, COLLESTER and SABATINO.
The opinion of the court was delivered by
COLLESTER, J.A.D.
J.M.B. is a fifty-five-year-old divorced man who was serving a state prison term of five years for tampering with a witness, N.J.S.A. 2C:28-5a(1), and an additional one year consecutive term for violation of a previously imposed probation. Before J.M.B.'s release, the Attorney General filed a petition for his civil commitment under the Sexually Violent Predator Act, N.J.S.A. 30:4-27.24 to -.38, (SVPA). An order was entered temporarily committing J.M.B. to the Special Treatment Unit (STU) pending an initial commitment hearing. Two clinical certificates were annexed which identified J.M.B. as a sexually violent predator under the SVPA. The commitment hearing began on July 9, 2004 and concluded on July 12, 2004. Judge Serena Perretti placed her decision on the record on July 20, 2004, and entered a judgment committing J.M.B. to the STU for treatment pending a review hearing in one year. The commitment has since been extended. Defendant appeals from Judge Perretti's initial judgment of commitment.
To be deemed a sexually violent predator under the SVPA, the individual must have been convicted, adjudicated delinquent, or found not guilty by reason of insanity, of a "sexually violent offense" or declared incompetent to stand trial for such an offense. N.J.S.A. 30:4-27.26. The statutory definition of a "sexually violent offense" is contained in N.J.S.A. 30:4-27.26(a) and (b). Subsection (a) lists the following offenses: aggravated sexual assault; sexual assault; aggravated criminal sexual contact; sexual contact; certain forms of kidnapping and felony murders; attempts to commit those enumerated acts; and all criminal offenses with substantially the same elements as those offenses. N.J.S.A. 30:4-27.26(a). Subsection (b) is a catchall provision to include "any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person's offense should be considered a sexually violent offense." N.J.S.A. 30:4-27.26(b). It does not matter when the offense was committed as long as it qualifies as a predicate offense under the SVPA. In re Commitment of P.Z.H., 377 N.J.Super. 458, 466, 873 A.2d 595 (App. Div.2005).
In addition to the determination that a person committed a sexually violent offense, the State must prove that the person is a threat to the health and safety of others because he or she "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26. Our Supreme Court has interpreted the statute to require the State to establish by clear and convincing evidence that it is "highly likely" the person will re-offend in the reasonably foreseeable future. In re Commitment of W.Z., 173 N.J. 109, 120, 130-31, 801 A.2d 205 (2002).
The State put forth proof as to several incidents leading to convictions it asserted *106 were sexually violent offenses under N.J.S.A. 30:4-27.26(b). The first incident took place on April 20, 1977 and involved children ages ten, twelve, and fourteen. J.M.B. was arrested by the Stafford Township Police Department and charged with contributing to the delinquency of a minor, intimidation, and threat to kill. He gave the police a statement in which he admitted that he picked up ten-year-old R.J. and took him to a wooded area where he attempted to tie him to a tree but then took him home. R.J. told police J.M.B. threatened to kill him if he told anyone. In his statement J.M.B. said he did not recall, but conceded he said it. J.M.B. said he later picked up the two other boys and drove them to his house to play pool. He tied up one in the bedroom, binding his hands and feet, and untied him about fifteen minutes later when the boy began to cry. He also admitted to serving alcohol to the boys and selling marijuana to one of them. He denied having sex with any of the boys, but admitted he got sexual gratification from tying up young males. He told police he only ties up male juveniles and had done so approximately twenty times, starting when he was in grade school.
J.M.B. was indicted in Ocean County for two counts of threat to kill, one count of contributing to the delinquency of a minor, and one count of distribution of marijuana to a juvenile. On August 19, 1977 he pleaded guilty to contributing to the delinquency of a minor and threat to kill. He was sentenced to an indeterminate term at the Youth Reception and Correction Center, suspended, and one year probation with a special condition to continue psychiatric treatment. The remaining charges were dismissed. The judge gave the following reasons for the sentence: "Although this is a serious series of offenses, this young defendant appears to have completely changed his lifestyle, and is making good progress with his psychiatric counseling."
The second incident leading to conviction took place on October 7, 1981. Fifteen-year old E.H. reported to the Warren Township police that he had been hitchhiking to school when he was picked up by a man he later identified as J.M.B.E.H. said that J.M.B. asked him if he wanted to get "high." When E.H. said yes, he got into J.M.B.'s car, and they drove to a dead-end where they got out and entered nearby woods. E.H. said J.M.B. grabbed him by the hair when he wasn't looking, threw him to the ground, pulled out a knife, held it to his throat, and told him to lay on his stomach. E.H. wrestled with J.M.B., broke free, and ran to a nearby house for help. The police were called, and J.M.B.'s car was stopped nearby. E.H. suffered a throat wound requiring five stitches. J.M.B. was indicted in Somerset County for second-degree aggravated assault and criminal restraint.
The third incident took place a month later, while J.M.B. was free on bail on the Somerset County indictment. On November 8, 1981, sixteen-year-old A.C. reported to the East Brunswick Police Department that he had been kidnapped at about two o'clock that afternoon by a man who he later identified as J.M.B. He explained that he had been walking along the sidewalk to his friend's house when a car pulled alongside him. The driver asked for directions to Edison and requested that A.C. point out the route on a map he kept in the glove box. As A.C. leaned into the car, he was hit on the head with a blunt object and lost consciousness. When he awoke, he was in a strange house, tied and gagged with his eyes taped, his hair taped together in places, and his mouth glued shut with Crazy Glue. After a substantial period of time, from one to three hours, the man removed the gag and told A.C. he *107 would let him go only if he agreed to let the man cut his hair; otherwise he could remain there, tied up. A.C. agreed, and the man ripped out some of his hair and cut the rest with scissors. He then cut the ropes off but left A.C. blindfolded while he drove him to a building near Route 1 where he let him go. After A.C. identified his picture in a photo lineup, J.M.B. was arrested. He admitted the facts given by A.C. were essentially correct.
J.M.B. pleaded guilty to the Middlesex County indictment charging kidnapping and aggravated assault on A.C. and was sentenced on April 26, 1982 to fifteen years for kidnapping and a concurrent ten-year term for aggravated assault. The sentencing judge called the offenses "depraved" and said J.M.B. was a danger to society who was likely to offend again. He added, "It is most unfortunate that the sex offenders act does not apply to him. I think he should have the benefit of that treatment." Later J.M.B. pled guilty to the Somerset County indictment for the criminal restraint of E.H. The aggravated assault charge was dismissed, and J.M.B. received a five-year sentence concurrent to the Middlesex County sentence.
After serving five years in state prison, J.M.B. was eligible for parole. The Parole Board referred him for an examination at the Diagnostic and Treatment Center in Avenel to assess the extent of J.M.B.'s pathology and the level of risk if paroled. Dr. Philip Witt performed that evaluation on November 18, 1986. During the interview, J.M.B. acknowledged his pattern of finding an adolescent male, incapacitating him, tying him up, and pulling out his hair. He denied any sexual acts with the victims, however, he admitted he found their bondage to be sexually exciting. Dr. Witt advised the Board that while J.M.B. had been in psychotherapy at Leesburg State Prison, he had not dealt directly with modifying his deviant sexual arousal pattern, and so he was still at risk to commit additional offenses and was a poor candidate for parole. J.M.B. maxed out on his sentence.
The third incident took place on July 12, 1989. J.M.B. was arrested in Warren County and charged with kidnapping, aggravated assault, and criminal sexual contact. The arrest was the result of a statement by twenty-year-old F.S., who said he met J.M.B. about nine months before when he was hitchhiking. He told J.M.B. that he was living day-to-day, and J.M.B. offered to help by giving him $100. F.S. told police that he and J.M.B. then engaged in bondage behavior over a period of six months. J.M.B. would handcuff, gag, and blindfold F.S. on a regular basis, and would threaten the twenty-year-old to prevent him from speaking with the police. In the final bondage encounter, F.S. said J.M.B. tied his hands and ankles and placed him on a pool table, where he blindfolded, gagged, and handcuffed him. J.M.B. then taped F.S.'s hair and tied the other end of the restraint to a beam in the ceiling. When F.S. objected, J.M.B. threatened him with a stun gun. He began to cut F.S.'s hair and told F.S., "I'll cut all your hair off or I'll hang you like I did before." F.S. also told police that "sometimes [J.M.B.] used to try to touch my private parts, and I'd push his hands away." J.M.B. was arrested and indicted for kidnapping, criminal restraint, terroristic threats, possession of a weapon for unlawful purposes, aggravated assault, and criminal sexual contact, which was his first and only charge for a sexual offense.
On January 10, 1991 J.M.B. pleaded guilty to criminal restraint in the third degree, terroristic threats in the third degree and possession of a weapon for unlawful purposes. The other charges, kidnapping in the first degree, aggravated *108 assault in the third degree, and criminal sexual contact in the fourth degree, were dismissed at sentencing. On March 1, 1991 J.M.B. was sentenced to seven years with two and one-half years parole ineligibility to New Jersey State Prison. He maxed out on this sentence on April 29, 1994.
Several months after his release, in December 1994, J.M.B. met fifteen-year-old S.S. at a Christmas party. J.M.B. was living in Pennsylvania at that time. S.S. was on furlough from Ranch Hope Program, where he was ordered after juvenile proceedings in the Family Court. He told J.M.B. he was unhappy there and wanted to live with him, and J.M.B. encouraged S.S. to run away from Ranch Hope. He wrote to S.S. and sent him money on occasion. On June 17, 1995, S.S. began another furlough and was scheduled to return to Ranch Hope on July 5, 1995. Instead, S.S. fled his house through a second-floor window to avoid being taken back. He called J.M.B. the next day and asked him to come get him in New Jersey.
A day or two later, J.M.B. met S.S. in Gloucester City and they traveled to J.M.B.'s residence in Pennsylvania. The next day J.M.B. told S.S. that if he could tie him up, he would give him $70 if S.S. was able to remove the restraints. S.S. agreed. J.M.B. then tied the fifteen-year-old's hands behind his back and tied his hands and feet together. When S.S. protested because J.M.B. began to attach the rope to his neck, J.M.B. threatened to use an apparatus with straps and a ball in the middle to gag him. S.S. said that at one point J.M.B. touched his penis but stopped when S.S. told him not to touch him. J.M.B. then played a male bondage video on the television while he watched S.S. attempt to remove the bindings. At another time, J.M.B. tied S.S.'s hands and feet and offered S.S. $20 if he could free himself from the bindings. When S.S. was able to do so, J.M.B. offered him another $20 if he could tie S.S. again and then tightly bound him. S.S. said each time J.M.B. would tie him up, J.M.B. would sit in front of him and watch him try to remove the bindings.
On July 20, 1995, S.S. and J.M.B. were found together in Stroud Township, Pennsylvania. J.M.B. was arrested on December 4, 1995 and charged in Camden County with interference with the custody of a committed person, a fourth-degree offense. He entered a guilty plea to the charge. On February 16, 1996 he was sentenced to five years probation. However, on June 25, 1999, his probation was revoked for his failure to remain arrest-free. He was sentenced to one year in New Jersey State Prison to be served consecutively with the Camden County sentence for interference with the custody of a committed person.
On April 3, 1997, J.M.B. was arrested and charged with harassment of nineteen-year-old W.S.W.S. told police that he had known J.M.B. for three weeks when he went to J.M.B.'s rented room because J.M.B. told him he was going to "initiate" him. W.S. consented to having his hands and feet bound, but when J.M.B. placed electrical tape over his eyes and a wet rag in his mouth, he asked J.M.B. to stop. J.M.B. continued, taped the rag over W.S.'s mouth, and guided him to a bed. W.S. demanded to be untied. J.M.B. complied, and took him home where W.S. told his mother. She called the police and the harassment charge was filed. The charge was subsequently downgraded in municipal court to a violation of the local loitering ordinance. J.M.B. pleaded guilty and was fined $400.
On September 9, 1997, J.M.B.'s car was stopped by a Westville police officer for a motor vehicle violation. While speaking to J.M.B., the officer saw handcuffs in the car *109 and arrested J.M.B. When the car was searched the police found chains, a rope with a "hangman's knot", several pairs of thumb cuffs, belts used for bondage, and other such items. He was charged with illegal possession of handcuffs, N.J.S.A. 2C:39-3(k), driving while suspended, and driving an uninsured vehicle. The record in this matter does not indicate a disposition.
On April 7, 1999, J.M.B. was stopped by the Evesham Township Police Department and arrested on an outstanding traffic warrant, as well as driving with an expired license. The police searched the vehicle and found in the trunk 100 photographs of gagged and bound boys or young men between the ages of fifteen and twenty-two. The photos had been taken between July 1998 and February 1999, and the police were able to identify eight of the males.
After receiving Miranda[1] warnings, J.M.B. gave an oral statement that was recorded and transcribed. He admitted taking the photographs, but he declined to give the names of the young males. He said they were all willing participants to the bondage. He said the pictures were taken in his room or in the basement of the carwash where he worked. He acknowledged giving them beer. The pictures showed the young males blindfolded and arranged in different poses with their hands and feet bound in different positions. One of the photographs showed what appeared to be an erect penis next to a boy's mouth. J.M.B. maintained that the object was not an actual penis but a "butt plug" purchased at an adult book store. He added that the blindfolded subjects were unaware of the presence of the butt plug. Taped to some of the photographs were locks of hair apparently taken from the young men. J.M.B. called the pictures his "trophies."
J.M.B. was charged with three counts of harassment, one count of contempt, and three counts of luring and enticing a child. He was remanded to the county jail in lieu of bail. While in jail he made many collect calls to J.R., one of the boys in the photographs. When J.M.B. was released on bail it was with the condition that he have no contact with the victims. Nonetheless, J.M.B. called J.R. at his home to dissuade him from testifying. He asked J.R. if he was going to show up at his trial, adding that if he and the others in the picture did not show up, there would be no evidence against him. In a later call to J.R., J.M.B. asked "if he was for him or against him." J.M.B. was then arrested and charged with tampering with a witness, N.J.S.A. 2C:28-5(a)(1). His bail was revoked. Following a motion to suppress in October 1999, the motion judge suppressed the photographs as evidence because they had been seized by the police without a warrant. After the order suppressing the photographs was executed, J.M.B. made application for their return.
Prior to the suppression of the photographs, the police tried to identify and locate the young males depicted. They met with fourteen-year-old A.V., who told them that J.M.B. rented space in his mother's driveway to park the mobile camper where he lived. A.V. said he borrowed $10 from J.M.B. and agreed to be tied up as repayment. He said he became scared after J.M.B. tied him up and blindfolded him with duct tape. J.M.B. told him if he continued to talk, he would gag him. After A.V. untied himself, J.M.B. told him not to tell anyone what happened. A.V. also said J.M.B. gave him beer and cigarettes. Detectives then spoke to D.F. and T.D., friends of A.V., who said J.M.B. also *110 tied them up inside the camper. Later, detectives spoke with W.M., an inmate at the Adult Diagnostic and Treatment Center (ADTC) who had corresponded with J.M.B. He said J.M.B. wrote to him about a boy he was interested in that lived in the house which he was renting, and that he was grooming the boy. No charges were ever filed against J.M.B. based on this information.
On April 12, 2002, J.M.B. pleaded guilty in Camden County to tampering with a witness. He was sentenced to a state prison term of five years. He was to max out on the sentence on or about February 4, 2004. The petition for civil commitment under the SVPA was filed on January 22, 2004.
At the civil commitment hearing, the State produced three expert witnesses, Dr. Luis Zeiguer, Dr. Rusty Reeves and Dr. Benjamin L. Liberatore. No other witnesses testified.
Dr. Zeiguer interviewed J.M.B. on February 9, 2004; J.M.B. declined to participate in a follow-up interview. On direct examination, Dr. Zeiguer testified that in order to assist his determination, he used independent sources commonly relied upon by psychiatrists for purposes of an evaluation including victim's statements, pre-sentence reports, investigation reports, and prior forensic psychological and psychiatric assessments. He stated that although incidents involving J.M.B. resulting in convictions were not specifically designated under the SVPA as sexual offenses, they were in fact sexual crimes because J.M.B.'s "sexual sadism" was done with "non-consensual partners." He said the young males qualified as victims because they did not explicitly consent to the extent of J.M.B.'s conduct and because most were not of a legal age to give consent. He further opined that J.M.B. received sexual satisfaction from tying up the victims, and he groomed them by giving them alcohol and marijuana to dampen their inhibitions.
Beginning with the 1977 incident, Dr. Zeiguer testified, J.M.B. was "sexually turned on by having a total control of the muscular voluntary system of his involuntary sexual partner . . . [T]his element persisted all through his offenses . . . the voluntary system of the partner has to be paralyzed by him. The partner has to be awake but has to have no control over his own muscular system. [T]he muscular system becomes an erotic element . . . for sexual sadism, the voluntary muscular system has a very special quality."
With reference to the 1981 offenses regarding fifteen-year-old E.H. and sixteen-year-old A.C., Dr. Zeiguer noted that the offenses took place within two months of each other, concluding that the close time frame showed J.M.B.'s urge was so strong that he took risks and had to be cunning in his methods of access to victims. The fact that the July 1989 offense involving F.S. was committed while J.M.B. was still on parole for his two 1981 offenses showed that he could not be deterred. The doctor explained that "[J.M.B.] cannot be deterred, [because] he does not learn from his experience. . . . [T]he [bondage] activity is so important, this need is so overpowering that he's willing to put at stake his freedom."
Dr. Zeiguer said his point was underscored by the fact that J.M.B.'s next offense took place only about eight months after his release from prison, when he made contact with fifteen-year-old S.S.J.M.B. was reasserting his persistence in seeking out juvenile males. Dr. Zeiguer said J.M.B.'s offense with nineteen-year-old W.S. was significant because it showed that he continued to groom "what appears to be a naïve innocent victim and, . . . convince a victim to get into some kind of *111 game, and then goes beyond what the victim agreed to . . ."
Dr. Zeiguer concluded that J.M.B. was affected by two disorders: sexual sadism (severe) and personality disorder with antisocial features. He said this combination of disorders allowed J.M.B. to act out his sexual drives with no consideration as to the victim's safety and well-being. He said J.M.B. lacks insight because he denied the sexual nature of his offenses, and the number of offenses shows that he cannot be deterred. Dr. Zeiguer opined that J.M.B. posed an "enormous" risk to re-offend in the foreseeable future unless confined to a secure facility for treatment.
Dr. Reeves conducted his forensic psychiatric evaluation of J.M.B. in January 2004. He said that he relied upon a list of various sources of information commonly used in his profession, including police investigation reports, pre-sentence reports, and prior psychological evaluations. He stated that use of such materials is necessary because a person participating in a forensic psychiatric evaluation has a great motivation to lie or distort facts. He said J.M.B.'s behavior pattern discerned from these sources was one of "sexual arousal to bondage, and more broadly, sexual sadism." When questioned about the locks of hair attached to some of the photographs, Dr. Reeves responded that J.M.B. had stated that the locks of hair were his "trophies," which indicated he had won total submission over his victims. He thought it significant that J.M.B. made application to the court for return of these items stating:
[I]t is further evidence of just how entrenched [J.M.B.] is in his . . . sexual sadism . . . [because] he is under scrutiny as being a sexually violent predator and now he's petitioning to have . . . [the] locks of hair returned to him which are elements of those same offenses. It shows incredibly poor judgment if one is trying to avoid being detained, but that's [J.M.B.], nothing stopped him in the past.
According to Dr. Reeves, the pattern that J.M.B. demonstrated was that he would achieve some measure of initial consent, then go beyond the consent, and end up frightening and humiliating his victims, even putting them in an extremely dangerous situation where their circulation and breathing were in jeopardy. During the interview, J.M.B. told him he had never committed an actual sex offense, that the motivation for his behavior was not sexual, and the persons consented to the bondage. To Dr. Reeves, this meant both that J.M.B. was not telling the truth and that he lacked any remorse for his offenses. His diagnosis of J.M.B. was the same as Dr. Zeiguer's: sexual sadism and antisocial personality disorder.
Dr. Liberatore is a clinical psychiatrist who testified as to his May 2002 psychological risk assessment of J.M.B., performed at the request of the release committee of the State Parole Board. He concluded that the offenses for which J.M.B. had been convicted were, in fact, sex offenses because the intent or actions of J.M.B. were for the purposes of his sexual gratification. He said J.M.B. admitted to recurring sadomasochistic fantasies involving young males between the ages of fifteen and twenty-two, and that J.M.B. was sexually gratified from his interactions with them. During the assessment, J.M.B. said he masturbated to videos depicting bondage. Dr. Liberatore also testified that J.M.B. had admitted that he had sexual contact with at least one victim.
Dr. Liberatore noted that J.M.B.'s repeated offenses in close proximity to his release from prison displayed "a competitive and compulsive pattern of behavior, a sexual deviant pattern of sexual arousal *112 and behaviors and that he is likely to act on them again." He said that J.M.B. expressed no remorse and admitted that he would repeat the bondage conduct when released from prison. He also testified that J.M.B. scored high on the MnSOST-R and Static-99, actuarial tests used for assessing the recidivism rate of sexually violent predators. Dr. Liberatore diagnosed J.M.B. with sexual sadism of adults and children. He said the conduct showed that J.M.B. had chosen victims who were fragile, and groomed them to diminish whatever consent they had given to bondage. He added that J.M.B. admitted to him that he had engaged in "encounters" with the individuals depicted in the bondage pictures. Finally, Dr. Liberatore opined that J.M.B. was highly likely to re-offend.
In her oral opinion of July 20, 2004, Judge Perretti acknowledged that J.M.B. had not been convicted of any of the offenses listed under N.J.S.A. 30:4-27.26(a). However, she found, based on the testimony of Drs. Zeiguer and Reeves, as corroborated by the documentary evidence, that J.M.B. had committed acts constituting sexually violent offenses, placing him within the purview of the SVPA. She stated the first such offense was the 1977 incident involving a ten-year-old and a fourteen-year-old. She concluded there was clear and convincing proof that the offense was a sexually violent offense because of the ages of the victims, the grooming behavior, the use of alcohol and drugs, the rope burns on one child, and the statements of J.M.B. at his plea and statement that he received sexual gratification.
Judge Perretti said that although J.M.B. received sexual gratification from the bondage with E.H. in 1981, the circumstances involving drugs led her to conclude that the incident involved a dispute of drug ownership. She found that although the incident was appropriate for consideration by the State's experts in coming to their conclusions, she was not convinced by clear and convincing evidence that the crime was a sexually violent offense.
Judge Perretti held that the November 1981 incident involving A.C. was a sexually violent offense. In addition to the pre-sentence investigation, J.M.B.'s plea to aggravated assault and the police report, Judge Perretti agreed with the observations of the sentencing judge that,
. . . [T]he nature and circumstances of the offense are such that it is a depraved offense. Defendant's mental health is such that he is likely to offend again. He is a danger to society, he must be deterred. His underlying problems must be met. If they are not met, he will continue to be a danger to society.
Judge Perretti also cited the November 18, 1986 report of Dr. Witt for the parole board, which was also considered by the state experts, wherein Dr. Witt concluded that there were clear elements of deviant sexual arousal to motivate J.M.B. and that he was a poor risk for parole "unless his deviant sexual arousal pattern is appropriately altered and directly addressed in psychotherapy."
Judge Perretti then considered the July 1989 incident in which nineteen-year-old F.S. was handcuffed, tied up, and blindfolded with his hair taped and attached to a beam running across the ceiling. The judge concluded that this was a sexually violent offense based on the expert testimony of Doctors Zeiguer and Reeves pertaining to the incident, J.M.B.'s own statements, and the sentencing judge's statement that J.M.B. went beyond the consent given by F.S. She next reviewed the incident with S.S., the fifteen-year-old boy who absconded from Ranch Hope to live with J.M.B. and who was tied up numerous times, once threatened with "a ball on a strap that goes around the head" to *113 gag his mouth. Although the conviction was for interfering with the custody of a committed person, Judge Perretti relied upon the judgment of conviction, the FBI report, and Dr. Liberatore's testimony to conclude that the incident constituted a sexually violent offense.
The final conviction that Judge Perretti specifically identified as a sexually violent offense was J.M.B.'s last conviction for tampering with a witness. She underscored that the circumstances involved bondage of an underage boy. She considered the pictures that were suppressed, ruling that the constitutional rationale for suppression of evidence was inapplicable to this civil proceeding. She held that the pictures were properly used by the expert psychiatrists in their evaluations and supported their diagnoses of sexual sadism. She made a specific factual finding based on the factual circumstances that the offense should be considered a sexually violent offense.
Based on the unrebutted testimony of Drs. Zeiguer, Reeves and Liberatore, which she deemed persuasive, Judge Perretti found that J.M.B. was and remains a sexual sadist with an antisocial disorder. She concluded that these abnormal conditions adversely affect his volitional, emotional, and cognitive capacity, so as to predispose him to commit sexually violent acts. Having made specific findings based on the circumstances resulting in the convictions that J.M.B. committed sexually violent offenses, Judge Perretti concluded:
It is my conclusion . . . that this respondent is a predator. This is the person for whom this statute was made . . . I find he has just about no control over his sex offending behavior and I find as a result thereof that he is highly likely to re-offend. He says he will. He promises us that he will. And that is a graphic depiction of his cognitive impairment. He doesn't even see it as wrong, and he doesn't even know that it is sexually connected.
Accordingly, Judge Perretti signed the commitment for J.M.B. for one year. We are advised that his commitment to the STU has continued after subsequent review hearings.
On appeal J.M.B. raises the following arguments:

POINT I  THE TRIAL JUDGE ABUSED HER DISCRETION BY COMMITTING [J.M.B.] UNDER THE SEXUALLY VIOLENT PREDATORS ACT, BASED UPON A FINDING THAT THE NON-SEXUAL CRIMES OF WHICH HE HAD BEEN CONVICTED OUGHT TO BE CONSIDERED SEXUALLY VIOLENT.
A. THE TRIAL JUDGE ERRED BY HERSELF MAKING THE DETERMINATION THAT THE NONSEXUAL CRIMES SHOULD BE CONSIDERED SEXUALLY VIOLENT WITHIN THE MEANING OF N.J.S.A. 30:4-27.26.
B. THE TRIAL JUDGE ERRED BY FINDING THAT THE NONSEXUAL CRIMES SHOULD BE CONSIDERED SEXUALLY VIOLENT OFFENSES, BASED SOLELY UPON PSYCHIATRIC TESTIMONY THAT [J.M.B.] DERIVED SEXUAL GRATIFICATION FROM CRIMES NOT ADJUDICATED TO BE SEX CRIMES, WHERE THERE WAS NO COMPETENT EVIDENCE OF CRIMINAL SEXUAL TOUCHING OR PENETRATION.

POINT II  THE TRIAL JUDGE ERRED BY COMMITTING J.M.B. INDEFINITELY ON THE BASIS OF AN UNCONSTITUTIONALLY VAGUE STATUTE.

*114 POINT III  THE TRIAL JUDGE ERRED BY RELYING UPON DOCUMENTARY HEARSAY EVIDENCE TO CONCLUDE THAT THE PREDICATE CRIMES SHOULD BE CONSIDERED SEXUALLY VIOLENT.
A. THE TRIAL JUDGE ERRED BY ADMITTING AND RELYING UPON REPORTS CONTAINING COMPLEX DIAGNOSES AND CONCLUSIONS BY NON-TESTIFYING EXPERTS, CONTRARY TO N.J.R.E. 808.
B. THE TRIAL JUDGE ERRED BY ADMITTING AND RELYING UPON POLICE REPORTS, INVESTIGATION REPORTS, WITNESS STATEMENTS AND ALLEGED ADMISSIONS OF [J.M.B.].

POINT IV  THE DEFINITION OF SEXUALLY VIOLENT OFFENSE IN THE ACT EXTENDS THE REACH OF CIVIL COMMITMENT SO FAR AS TO RENDER THE ACT PUNITIVE AND THEREFORE A VIOLATION OF THE CONSTITUTIONAL GUARANTEES AGAINST EX POST FACTO LAWS AND DOUBLE JEOPARDY.
Our scope of review of civil commitment judgments is exceedingly narrow. In re Civil Commitment of V.A., 357 N.J.Super. 55, 63, 813 A.2d 1252 (App. Div.), certif. denied, 177 N.J. 490, 828 A.2d 917 (2003). We must give the "utmost deference" to the reviewing judge's determination of the appropriate balancing of societal interest and individual liberty. In re J.P., 339 N.J.Super. 443, 459, 772 A.2d 54 (App.Div.2001) (citing State v. Fields, 77 N.J. 282, 311, 390 A.2d 574 (1978)). That determination will be subject to modification on appeal only where the record reveals a clear abuse of discretion. Ibid. Accordingly, it is our responsibility to canvass the record inclusive of the expert testimony to determine whether the findings made by the trial judge were clearly erroneous. In re D.C., 146 N.J. 31, 58-59, 679 A.2d 634 (1996).

I.
J.M.B. first argues that Judge Perretti erred in interpreting N.J.S.A. 30:4-27.26(b) permitting her to find that a non-sex crime could constitute a sexually violent offense as a predicate for commitment under the SVPA. We disagree.
The Act defines "sexually violent predator" as:
a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of sexually violent offense or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.
[N.J.S.A. 30:4-27.26.]
The statutory definition of a "sexually violent offense" includes the following:
(a) aggravated sexual assault; sexual assault; aggravated criminal sexual contact; kidnapping pursuant to subparagraph (b) of paragraph (2) of subsection (c) of N.J.S.A. 2C:13-1; criminal sexual contact; felony murder pursuant paragraph (3) of N.J.S.A. 2C:11-3 if the underlying crime is sexual assault; an attempt to commit any of these enumerated offenses; . . . or
(b) any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person's offense should be considered a sexually violent offense.
[Ibid.]
*115 There is no dispute that J.M.B. was not convicted of any of the offenses listed in subsection (a) of N.J.S.A. 30:4-27.26. In fact, none of his convictions are included in the sexual offenses section of the criminal code. N.J.S.A. 2C:14-1 to -10.[2] J.M.B. argues that his convictions could not be properly considered as sexually violent offenses under subsection (b) of N.J.S.A. 30:4-27.26. However, the unrefuted testimony of the state experts, documentary evidence, and J.M.B.'s own statements and admissions speak otherwise. The convictions for threats to kill, kidnapping, aggravated assault, criminal restraint, and terroristic threats are clearly violent offenses. Moreover, the facts and circumstances surrounding all of his convictions contain elements of violence and speak loudly of sexual compulsion. Binding, gagging, and blindfolding these young males was intended to humiliate them for J.M.B.'s sexual gratification.
J.M.B.'s assertion that the young males consented to the bondage activity is contradicted by the law, the facts, and circumstances of the offense. Consent must be a knowing consent freely given and not induced by force, duress or deception. N.J.S.A. 2C:2-10(c)(3). The facts belie any such knowing consent. The 1977 incident involved boys ages ten, twelve and fourteen. By his own admission he served alcohol and sold marijuana to groom them. He took the ten-year-old to a wooded area to tie him up to a tree and threatened to kill him if he told anyone. One boy cried when J.M.B. was tying him up. In the 1981 incident J.M.B. kidnapped a fifteen-year-old off the street. After knocking him unconscious, he tied and gagged the boy and then cut and pulled his hair. In 1995 he induced fifteen-year-old S.S. to run away from a correctional facility and groomed him by offering him money. When S.S. objected during bondage, J.M.B. threatened him and said he would use a strap and ball to gag him if he did not stop crying. He later threatened S.S. with harm if he told anyone.
J.M.B. chose his victim's carefully. Most of them were children incapable of understanding, much less consenting to J.M.B.'s desires. All were fragile and trusting youths misled into a submission well beyond their consent. One was simply knocked unconscious. And certainly none of them consented to be photographed to provide J.M.B. with a "trophy."
In this case, the use of force, coercion, threats of physical harm, lack of knowing consent, exploitation of underage victims, and grooming them with drugs or alcohol to satisfy J.M.B.'s compulsive sexual gratification presents sufficient circumstances for Judge Perretti's finding that J.M.B.'s offenses were "sexually violent offenses" under subsection (b) of N.J.S.A. 30:4-27.26.
From 1977 to 2002 J.M.B. was arrested fifteen times on charges that were factually related to his bondage of pre-pubescent and post-pubescent males. He amassed five indictable convictions as well as violations of probation and parole. He received sentences ranging from probation to state prison terms of fifteen years. Although compulsive in his repetitive and deviant sexual behavior, he was never sentenced to the Adult Diagnostic and Treatment Center because his convictions did not fit the crimes eligible for that sentence. See N.J.S.A. 2C:47-1. His victims were young and vulnerable. He remains undeterred and unrepentant and is practically certain to do it again. As indicated by expert testimony and stated by Judge Perretti, *116 J.M.B. is just the type of individual envisioned by the SVPA  a sexual predator whose mental conditions demand treatment in a secure facility for the protection of the public.
We conclude that the catchall provision of subsection (b) of N.J.S.A. 30:4-27.26 may encompass offenses other than those denoted in subsection (a), or those entitled sexual offenses of the criminal code, and the committing court may consider the factual circumstances in making the determination of a sexually violent offense. In this case Judge Perretti properly interpreted N.J.S.A. 30:4-27.26 to find that J.M.B. committed sexually violent offenses under the SVPA, and her factual findings were well supported by the record. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974).

II.
At the outset of the commitment hearing, counsel for J.M.B. made a general objection to the admission of hearsay evidence. J.M.B. now contends that it was error for the judge and the testifying experts to consider reports of the circumstances of J.M.B.'s convictions because the police reports and pre-sentence investigation reports contained inadmissible hearsay. He also contends that the testifying experts improperly relied on earlier psychiatric evaluation reports in reaching their conclusions.
A trial court's evidentiary rulings are subject to deference absent a showing of abuse of discretion for clear error in judgment. State v. Brown, 170 N.J. 138, 147, 784 A.2d 1244 (2001) (quoting State v. Marrero, 148 N.J. 469, 484, 691 A.2d 293 (1997)) 7; In re the Commitment of R.S., 339 N.J.Super. 507, 531, 773 A.2d 72 (App. Div.2001), aff'd, 173 N.J. 134, 801 A.2d 219 (2002). We find that Judge Perretti properly admitted the reports both to consider the circumstances of the offenses to determine whether J.M.B. committed a "sexually violent offense" within the meaning of N.J.S.A. 30:4-27.26(b), and to evaluate the opinions of the testifying experts who considered these documents in reaching their diagnoses.
Hearsay statements upon which an expert relies are ordinarily admissible if they are a type reasonably relied upon by experts in the field. State v. Vandeweaghe, 351 N.J.Super. 467, 480, 799 A.2d 1 (App.Div.2002); N.J.R.E. 703. An expert can legitimately use hearsay evidence to confirm an opinion reached by independent means. State v. Alexander, 7 N.J. 585, 597-98, 83 A.2d 441 (1951), cert. denied, 343 U.S. 908, 72 S.Ct. 638, 96 L.Ed. 1326 (1952); Blanks v. Murphy, 268 N.J.Super. 152, 163-64, 632 A.2d 1264 (App.Div.1993). Thus, a psychiatrist is permitted to testify about a defendant's prior criminal history to offer an opinion as to defendant's mental condition. State v. Eatman, 340 N.J.Super. 295, 302, 774 A.2d 571 (App.Div.2001).
Dr. Zeiguer and Dr. Reeves both testified that the documents they relied on were commonly used by experts in the field of sex offender risk assessment. Judge Perretti accepted their testimony and found that she needed to review the documents to determine the credibility of the experts in order to make a determination under N.J.S.A. 30:4-27.26(b). Since Dr. Zeiguer and Dr. Reeves both testified that the pre-sentence reports and police reports were of a type reasonably relied upon by them in formulating the evaluation of J.M.B.'s mental condition to determine if he constituted a sexually violent predator under the SVPA, the reports were properly received in evidence as items or data in support of their diagnoses. *117 In re Civil Commitment of M.L.V., 388 N.J.Super. 454, 468, 909 A.2d 286 (App. Div.2006); In re Civil Commitment of A.E.F., 377 N.J.Super. 473, 490, 873 A.2d 604 (App.Div.2005); In re Civil Commitment of J.H.M., 367 N.J.Super. 599, 612-13, 845 A.2d 139 (App.Div.2003).
Clearly it was proper for the testifying experts to rely on J.M.B.'s own statements to formulate their diagnoses and opinions since such statements were admissible under N.J.R.E. 803(b)(1) as statements of a party. M.L.V., supra, 388 N.J.Super. at 469, 909 A.2d 286. Moreover, in this case, J.M.B. corroborated his admissions to the police through his statements to the testifying experts during his interviews.
We have previously held that in commitment hearings, pre-sentence investigation reports are also admissible since they are the type of evidence reasonably ruled on by psychiatrists in formulating an opinion as to an individual's mental condition. A.E.F., supra, 377 N.J.Super. at 473, 873 A.2d 604; In re Commitment of E.S.T., 371 N.J.Super. 562, 576, 854 A.2d 936 (App.Div.2004); In re Civil Commitment of J.H.M., 367 N.J.Super. 599, 611-14, 845 A.2d 139 (App.Div.2003), cert. denied, 179 N.J. 312, 845 A.2d 137 (2004). Furthermore, official reports, including police reports, were properly considered and used by the court as relevant background information and were properly considered by the experts, although the included hearsay may not be admitted as substantive information. See J.H.M., supra, 367 N.J.Super. at 613, 845 A.2d 139; In re Commitment of A.X.D., 370 N.J.Super. 198, 201, 851 A.2d 37 (App.Div.2004); N.J.R.E. 803(c)(6). See also Matter of C.A., 146 N.J. 71, 98, 679 A.2d 1153 (1996) (use of criminal history may be considered in evaluating risk of re-offense in Megan's Law hearings).
Moreover, the admission of the photographs taken by J.M.B. of young males he tied up, gagged, and blindfolded were properly admitted for consideration of the court and the testifying expert witnesses for purpose of their evaluation of J.M.B. as a sexually violent predator. Although suppressed in the criminal proceeding, they could be considered in this civil proceeding since the exclusionary rule does apply to civil actions. See Tartaglia v. Paine Webber, Inc., 350 N.J.Super. 142, 148-49, 794 A.2d 816 (App.Div.2002).
J.M.B. argues it was error for the testifying experts to rely upon earlier psychiatric reports containing complex diagnoses and conclusions. He points out that the State's experts at trial, as well as the court, considered complex medical opinion and diagnoses in reports by non-testifying experts who did not treat J.M.B. We have held that it is improper for a trial judge to consider for their truth any complex diagnoses contained in such reports to the extent that the diagnoses were contested. A.X.D., supra, 370 N.J.Super. at 202, 851 A.2d 37. However, in this case there is no contrary evidence or expert testimony contesting the diagnoses. Moreover, reports and documents normally relied upon by psychiatrists or psychologists to determine if the committee is a sexually violent predator are admissible, although they may not provide a basis "for wholesale and uncritical admission of prior forensic evaluations" in a SVPA commitment proceeding. A.E.F., supra, 377 N.J.Super. at 492, 873 A.2d 604. In E.S.T., supra, 371 N.J.Super. 562, 854 A.2d 936, cited by J.M.B., the opinions of the expert witnesses were based substantially on the opinions of the authors of the forensic examination reports in support of the application for temporary commitment, neither of whom were testifying witnesses *118 in the commitment hearing. We stated in those circumstances,
It does not comport with fundamental fairness to have the opinions of the non-testifying experts bootstrapped into evidence through the testimony of the testifying experts without an opportunity for cross-examination of the underlying opinions.
[Id. at 575, 854 A.2d 936.]
In this case the experts did not impermissibly rely upon the clinical certificates or prior psychiatric evaluations of non-testifying experts to determine J.M.B.'s current risk to engage in acts of sexual violence. In fact, Dr. Reeves was the author of one of the clinical certificates, and Dr. Liberatore authored a prior evaluation.
SVPA judges are expected to carefully scrutinize the materials relied upon by the experts so that its use is not abused. In re Commitment of G.G.N., 372 N.J.Super. 42, 56, 855 A.2d 569 (App.Div. 2004). A.E.F., supra, 377 N.J.Super. at 492, 873 A.2d 604, stated that "[p]rior evaluations may be considered but should be utilized carefully in recognition of their hearsay nature." Our review of the record convinces us that Judge Perretti did not use the prior evaluations in an improper manner but considered them in evaluating the credibility and opinions of the testifying experts who considered them in reaching their own diagnoses of J.M.B. Therefore, we find that the State's testifying experts properly relied upon the medical reports, pre-sentence reports, and other documents, as well as their interviews with J.M.B. in concluding that he was a sexually violent predator very likely to offend if not confined for treatment at the STU.
Finally, if we adopt J.M.B.'s position that the commitment court could not permit consideration of police reports, pre-sentence investigations, or reports of prior evaluations on the issue of whether J.M.B. committed a sexually violent offense under the SVPA, all that could be considered by the court and the testifying psychiatrists would be J.M.B.'s statements to the testifying psychiatrists and the earlier clinical evaluation by Dr. Liberatore. In this case, J.M.B.'s admissions could well form the basis for the psychiatrists' diagnoses and opinions as well as the court's finding of sexually violent offenses. However, a requirement of such a circumscribed or restricted hearing would conflict with the purpose of the SVPA to identify and protect the public from a sexual predator as well as to provide treatment for the sex offender. Accordingly, we hold that testifying experts and the trial judge may consider the prior evaluations of J.M.B. as well as official reports of his actions and behavior inclusive of hearsay statements, not as substantive evidence but for the expert to confirm a diagnosis and for the court to determine whether, "based on the circumstances of the case, the person's offense should be considered a sexually violent offense." N.J.S.A. 30:4-27.26(b).

III.
J.M.B. attacks the constitutionality of the SVPA first on grounds that the Act is punitive and therefore violative of the constitutional guarantees of ex post facto laws and double jeopardy. We have previously considered and rejected the same argument. J.H.M., supra, 367 N.J.Super. at 608, 845 A.2d 139. See Kansas v. Hendricks, 521 U.S. 346, 360-68, 117 S.Ct. 2072, 2081-85, 138 L.Ed.2d 501, 514-21 (1997). The SVPA is not a criminal statute but rather a civil commitment statute with one its primary objectives being the treatment of the sex offender. Ibid. The involuntary commitment under the SVPA is not punitive but a consequence of a reasoned balance between the liberty interest of a committee in need of treatment for emotional disorders and protection *119 of the citizenry from those who have demonstrated an inability to control their sexual violent behavior and are highly likely to re-offend. There is no constitutional infirmity.
Finally, there is no merit to the argument that N.J.S.A. 30:4-27.26(b) is unconstitutionally vague as applied to him. A statute is void for vagueness when it either "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Construction, Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926) (quoted in Karins v. Atlantic City, 152 N.J. 532, 541, 706 A.2d 706 (1998)). A vague statute will violate due process if there is a lack of warning or notice that certain actions will constitute its violation. State v. Hoffman, 149 N.J. 564, 581, 695 A.2d 236 (1997); State v. Afanador, 134 N.J. 162, 170, 631 A.2d 946 (1993).
N.J.S.A. 30:4-27.26(b) is clear in its terms. The commitment judge must make a specific finding that based on the circumstances of the case, an offense should be considered a sexually violent offense. The section is a catch-all provision to encompass an offense not listed in subsection (a) but characterized by the same form of conduct such as violence, intimidation, or exploitation of non-consenting victims, including children or other vulnerable persons, for the sexual gratification of the actor. In this case, J.M.B. admitted that he knew and was told he could not engage in his bondage behavior with others who did not consent. There was no constitutionally vague application of N.J.S.A. 30:4-27.26(b).
Affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The criminal code sexual offenses are aggravated sexual assault (2C:14-2a), sexual assault (2C:14-2b), aggravated criminal sexual contact (2C:14-3a), and lewdness (2C:14-4).