964 A.2d 752

IN THE MATTER OF THE CIVIL COMMITMENT
OF J.M.B., SVP–358–04.

Argued September 8, 2008—Decided February 23, 2009.

*Joan D. Van Pelt,* Deputy Public Advocate, argued the cause for appellant J.M.B. (*Ronald K. Chen,* Public Advocate, attorney; *Ms. VanPelt* and *William F. Culleton,* Designated Counsel, on the briefs).

*Lisa Marie Albano,* Deputy Attorney General, argued the cause for respondent State of New Jersey (*Anne Milgram,* Attorney General of New Jersey, attorney; *Melissa H. Raksa,* Deputy Attorney General, of counsel).

Justice LaVECCHIA delivered the opinion of the Court.

Following a hearing, a trial court ordered the civil commitment of J.M.B. to the Department of Corrections' Special Treatment Unit (STU) for sexually violent persons. The Attorney General petitioned for J.M.B.'s commitment under New Jersey's Sexually Violent Predator Act (SVPA or Act), *N.J.S.A.* 30:4–27.24 to –27.38, which defines a "sexually violent predator" as a person who has been "convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense." *N.J.S.A.* 30:4–27.26. A "sexually violent offense" can be any offense specifically listed as such in the SVPA. *See N.J.S.A.* 30:4–27.26(a) (subsection (a)). It also can be "any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person's offense should be considered a sexually violent offense." *N.J.S.A.* 30:4–27.26(b) (subsec-

tion (b)). Because J.M.B.'s convictions were not for any of the offenses listed in the SVPA, the State petitioned for civil commitment under the subsection (b) standard.

The civil commitment court found that four of J.M.B.'s prior offenses constituted "sexually violent offenses" and ordered his commitment to the STU. J.M.B. appealed, raising several novel questions about the application of subsection (b)'s definition of "sexually violent offense" as the basis for civil commitment. In affirming the trial court's order of commitment, the Appellate Division rejected all of J.M.B.'s arguments. *In re Commitment of J.M.B.*, 395 *N.J.Super.* 69, 928 *A.*2d 102 (2007). We granted J.M.B.'s petition for certification, 193 *N.J.* 222, 936 *A.*2d 969 (2007), and now we also affirm the order of commitment.

## I.

J.M.B. has been convicted of eight prior offenses, most of which involve patterned and unusual behavior in respect of his victims. In each case he pleaded guilty and was sentenced to serve time in a correctional facility or was fined. According to the State, J.M.B. is a sexually violent predator who requires civil commitment notwithstanding that only once was he charged with an offense that is included in subsection (a)'s list of sexually violent offenses, (incident number four involving the victim, F.S., in 1989), and that charge was dismissed when J.M.B. pleaded guilty to different charges. Before summarizing the incidents underlying J.M.B.'s offenses and the commitment court's findings, we turn first to the unique aspect of the statutory scheme that provides the basis for the State's civil commitment application in this matter.

## II.

### A.

New Jersey's SVPA provides for the involuntary commitment of any person who requires "continued involuntary commitment as a sexually violent predator." *N.J.S.A.* 30:4–27.32(a). The Legisla-

ture enacted the SVPA to protect other members of society from the danger posed by sexually violent predators. *N.J.S.A.* 30:4–27.25. The Act is intended "to modify the involuntary civil commitment process in recognition of the need for commitment of those sexually violent predators who pose a danger to others should they be returned to society." *N.J.S.A.* 30:4–27.25(c). Whereas earlier laws provided for the involuntary commitment of the mentally ill, the Legislature declared the new legislation necessary because "[t]he nature of the mental condition from which a sexually violent predator may suffer may not always lend itself to characterization under the existing statutory standard, although civil commitment may nonetheless be warranted due to the danger the person may pose to others as a result of the mental condition." *N.J.S.A.* 30:4–27.25(b).

The Act provides that "[w]hen it appears that a person may meet the criteria of a sexually violent predator as defined in this act, the agency with jurisdiction shall give written notice to the Attorney General." *N.J.S.A.* 30:4–27.27(a). Upon notification,

the Attorney General may initiate a court proceeding to have a person, including an inmate scheduled for release upon expiration of his or her maximum term of incarceration, involuntarily committed as a sexually violent predator, "by submission to the court of two clinical certificates for a sexually violent predator, at least one of which is prepared by a psychiatrist." *N.J.S.A.* 30:4–27.28b & c.

[*State v. Mumin*, 361 *N.J.Super.* 370, 382, 825 *A.2d* 1144 (App.Div.2003) ].

In commitment proceedings, the State must demonstrate by clear and convincing evidence that the individual poses "a threat to the health and safety of others if he or she were found ... to have serious difficulty in controlling his or her harmful behavior such that it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend." *In re Commitment of W.Z.*, 173 *N.J.* 109, 130, 801 *A.2d* 205 (2002). Put succinctly, "[c]ommitment under the Act is contingent on proof of past sexually violent behavior, a current mental condition, and a demonstrated inability to adequately control one's sexually harmful conduct." *State v. Bellamy*, 178 *N.J.* 127, 136, 835 *A.2d* 1231 (2003).

■ In order to trigger application of the provisions of the SVPA, a person must first be deemed a "sexually violent predator." *N.J.S.A.* 30:4–27.27(a). A "sexually violent predator" is defined as

> a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

[*N.J.S.A.* 30:4–27.26.]

A "sexually violent offense," in turn, carries two definitions:

> (a) aggravated sexual assault; sexual assault; aggravated criminal sexual contact; kidnapping pursuant to subparagraph (b) of paragraph (2) of subsection c. of N.J.S.2C:13–1; criminal sexual contact; felony murder pursuant to paragraph (3) of N.J.S.2C:11–3 if the underlying crime is sexual assault; an attempt to commit any of these enumerated offenses; or a criminal offense with substantially the same elements as any offense enumerated above, entered or imposed under the laws of the United States, this State or another state; or

> (b) any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person's offense should be considered a sexually violent offense.

[*N.J.S.A.* 30:4–27.26(a), (b).]

Although we have, on several occasions, addressed the legal and procedural requirements for involuntary commitment under subsection (a), *see, e.g., Bellamy, supra,* 178 *N.J.* at 136, 835 *A.*2d 1231; *In re Commitment of W.Z., supra,* 173 *N.J.* at 125–34, 801 *A.*2d 205, for the first time, we are being asked by the Attorney General to approve the continued involuntary commitment of an inmate under subsection (b).

### B.

The legislative history of the SVPA itself gives little guidance on the application of *N.J.S.A.* 30:4–27.26(b)'s definition of a sexually violent offense. However, the plain language, purpose, and internal logic of the Act all signal that it was intended to grant courts the authority to approve the involuntary commitment of an indi-

vidual who does not have a conviction for a sexually violent offense as defined in subsection (a).

First, the language of subsection (b) plainly states that a sexually violent offense is "any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person's offense should be considered a sexually violent offense." *N.J.S.A.* 3:40–27.26(b). It is significant that, although subsection (a) contains a provision intended to encompass federal crimes, and crimes of "this State or another state" that have "substantially the same elements as any offense enumerated" in *N.J.S.A.* 30:4–27.26(a), the Legislature also included the authorization in subsection (b) for a court to make its own "finding on the record, based on the circumstances of the case," that a "person's offense should be considered a sexually violent offense." *N.J.S.A.* 30:4–27.26(b). That provision would be rendered a nullity were it to be read as simply a reiteration of the concept in subsection (a), that a court may find a crime having "substantially the same elements as an enumerated offense" to be a sexually violent offense.

Interpretations that render the Legislature's words mere surplusage are disfavored. Rather, as we said in *D'Annunzio v. Prudential Insurance Company of America*, 192 *N.J.* 110, 927 *A.2d* 113 (2007), our task requires that every effort be made to find vitality in the chosen language.

"When interpreting a statute or regulation, we endeavor to give meaning to all words and to avoid an interpretation that reduces specific language to mere surplusage." *DKM Residential Props. Corp. v. Twp. of Montgomery*, 182 *N.J.* 296, 307, 865 *A.2d* 649 (2005) (citing *Franklin Tower One v. N.M.*, 157 *N.J.* 602, 613, 725 *A.2d* 1104 (1999); Norman J. Singer, 2A *Sutherland Statutory Construction* § 46:06, at 190–92 (6th ed.2000)).

[*D'Annunzio, supra*, 192 *N.J.* at 129, 927 *A.2d* 113.]

*See also Ramapo River Reserve Homeowners Ass'n, Inc. v. Borough of Oakland*, 186 *N.J.* 439, 450, 896 *A.2d* 459 (2006) (recognizing need to "ascribe to the statutory words their ordinary meaning and significance, and [to] read them in context with related provisions so as to give sense to the legislation as a whole" in

fulfillment of court's duty to reconcile discrete statutory provisions and construe them as "a unitary and harmonious whole") (quotations and internal citations omitted). Applying those principles to subsection (b) requires that it be read to confer additional authority on a court to determine an offense, which is not listed in subsection (a) and which does not have substantially the same elements as an enumerated offense, to be, nevertheless, a sexually violent offense.

That interpretation appears consistent with the overall intent of the Legislature when enacting this comprehensive scheme for the civil commitment of sexual predators. The Legislative findings clearly make paramount the SVPA's intention to protect society through the "commitment of those sexually violent predators who pose a danger to others should they be returned to society." *N.J.S.A.* 30:4–27.25(c). In furtherance of that stated goal, the Legislature found it necessary to include the additional authority conferred through subsection (b), authorizing a court to identify a person as a sexually violent predator even when he or she has not been convicted of an offense that fits precisely, or with substantial equivalence, the elements of the crimes encompassed in subsection (a)'s listing.

Indeed, subsection (b) is not the only instance within the SVPA in which the Legislature sought to authorize the involuntary commitment of persons who have not been convicted of a subsection (a) enumerated offense. The Act also provides for the civil commitment of "persons lacking mental capacity to stand trial." *N.J.S.A.* 30:4–27.33. Although neither a person unable to stand trial nor a person convicted of a crime other than those listed in subsection (a) will technically have been convicted of an enumerated sexually violent offense, it is clear that the Legislature intended to endow the Attorney General with the authority to seek the continued involuntary commitment of persons falling into both categories.

The Legislature's intent to apply the SVPA to those whose convictions occurred before the enactment of the SVPA also

informs our interpretation of subsection (b). In *Bellamy, supra,* this Court held that "civil commitment under the Act is a collateral consequence" of a defendant's decision to plead guilty to an enumerated offense. 178 *N.J.* at 138, 835 *A.*2d 1231. This Court found therefore that an inmate convicted prior to enactment of the SVPA "of a predicate offense under the Act" need not have been informed of the Act's consequences. *Id.* at 138–39, 143, 835 *A.*2d 1231. At the same time, however, the Court imposed a prospective requirement that, "prior to accepting a guilty plea to a predicate offense, trial courts must inform defendants of possible consequences under the Act." *Id.* at 143, 835 *A.*2d 1231. Thus, *Bellamy* makes clear that, although it is desirable, and now required, for a person whose convictions may subject him or her to commitment under the SVPA to be informed of such a consequence prior to entering a guilty plea, the lack of that notice does not preclude application of the SVPA to those whose convictions preceded the *Bellamy* holding. That the SVPA permits involuntary commitment of individuals who pleaded guilty to predicate offenses without notice is consistent with the holding that subsection (b) authorizes a court to determine, post-conviction, whether a person's conduct in connection with a conviction for an offense not listed in subsection (a) nevertheless may be found to constitute a sexually violent offense.

That said, subsection (b) does not confer unlimited authority on the Attorney General to seek out persons convicted of offenses other than those listed in subsection (a), and to attempt indiscriminately to commit them. Subsection (b)'s open-ended definition cannot reasonably be read as an invitation to commit persons. The two subsections must be harmonized for otherwise subsection (b)'s definition would swallow up subsection (a)'s specific grounds for commitment: the list of enumerated offenses and the delineation of foreign and other convictions comprised of "substantially the same" elements.

To our knowledge, the only decision to address the relationship between the two provisions, *In re Commitment of J.P.,* 393

*N.J.Super.* 7, 922 *A.*2d 754 (App.Div.2007), reasoned that such harmonization was necessary when determining the findings required for a sexually violent offense under subsection (b). The *J.P.* court focused on the type of conduct that subsection (a)'s offenses capture.

> The open-ended definition in subsection (b) must be interpreted in the light of the scope of the associated specific definitions in subparagraph (a).... When read together, the rational construction of these two paragraphs shows that the Legislature considered it appropriate to expand "sexually violent offense" to also include *conduct which demonstrates the elements of the enumerated sexually violent offenses* delineated in *subsection (a)*, even though the conviction may be for an offense other than those specifically listed. The specific findings requirement in *subsection (b)* assures that not just any conduct suffices; the demonstrated conduct must be in the nature of the type of sexual offenses enumerated.

[*Id.* at 16–17, 922 *A.*2d 754 (emphasis added).]

The approach taken in *In re Commitment of J.P.* reads the two provisions together and sensibly reconciles them. Subsection (b) must encompass more than just those offenses whose *elements* are substantially equivalent to the predicate offenses listed in subsection (a) because otherwise it would be mere surplusage. At the same time, subsection (b) cannot be so broad as to subsume subsection (a). By focusing on a defendant's conduct underlying an offense claimed to be sexually violent under subsection (b), and not just on the elements of the offense, the conduct precipitating commitment under subsection (b)'s definition of a sexually violent offense can be kept compatible with the standards gleaned from the crimes identified in subsection (a), notwithstanding that the predicate conviction is for an offense whose elements do not encompass completely the sexually violent conduct.

The "substantially equivalent conduct" standard that we find the Legislature envisioned, when allowing for this additional sliver of offenses to be swept in by subsection (b)'s definition of a sexually violent offense, is both narrow and practical. In the case where, by happenstance (such as a plea bargain or otherwise lenient charging) a defendant ends up with a conviction for a crime whose elements do not match, with substantial similarity, the offenses listed in subsection (a), the substantial equivalence of the defen-

dant's underlying *conduct* in connection with that conviction ought to keep the perpetrator within the purview of the SVPA's application.

We conclude that the legislative intent in including subsection (b)'s authority within the definition of a sexually violent offense was to expand, narrowly and with reference to the conduct encompassed by the crimes listed in subsection (a)'s definition, the offenses for which subsection (b) would provide the predicate to an application for civil commitment under the SVPA. We hold therefore that when faced with an application for civil commitment under subsection (b), a court may consider the circumstances that led to the qualifying prior conviction. When that conduct is substantially equivalent to the sexually violent conduct encompassed by the offenses listed in subsection (a), then that prior conviction may provide the predicate for a commitment application under subsection (b). We further hold that that determination may be made by the committing court, on application by the Attorney General. The SVPA clearly contemplated that such a determination might be made after the fact of conviction and at the time commitment is sought because the SVPA plainly applies to persons whose convictions preceded the SVPA's enactment.

In such an application, the proofs are straightforward. The individual's prior conviction would have been established through a trial based on proof beyond a reasonable doubt, or through the entry of a guilty plea. However, the SVPA is not part of the criminal code and it has been clearly determined that civil commitment under the SVPA is not punitive. *See Bellamy, supra,* 178 *N.J.* at 138, 835 *A.*2d 1231. Therefore, and in sum, in the civil SVPA commitment proceeding two essential findings must be established. First, the fact of the prior, predicate conviction must be established. To accomplish that the State must prove that the conviction was entered and that the person who was convicted is the same person whose commitment is sought. Second, the person's conduct, in the circumstances underlying the conviction, must be demonstrated to be substantially equivalent to

the sexually violent conduct that concerned the Legislature and led to the inclusion of the offenses listed in subsection (a). To prove the "fact" of the prior conviction, and the "fact" that the circumstances of the individual's case satisfy the substantially equivalent standard for sexually violent conduct, both of which are necessary for civil commitment, the SVPA provides the applicable standard of proof: clear and convincing evidence is required. *See* *N.J.S.A.* 30:4-27.32(a).[1]

■ Our dissenting colleague suggests that the SVPA requires a finding under *N.J.S.A.* 30:4-27.26(b) beyond a reasonable doubt. We disagree. That conclusion upends the paradigm established by the Legislature for SVPA decisions. The SVPA is a civil statute hence, the burden it establishes for relevant findings is clear and convincing evidence. *See N.J.S.A.* 30:4-27.32(a). To be sure both subsections (a) and (b) will involve findings of guilt beyond a reasonable doubt because that is the standard for a criminal conviction. Once a conviction occurs, the beyond a reasonable doubt standard drops out of the case. It is then that the SVPA itself becomes operative. Under the Act, the additional finding that a particular offense is sexually violent already has been made by the Legislature in subsection (a), which denominates a class of offenses as qualifying. To the contrary, subsection (b) requires that finding by the trial judge. There is simply no reason why that finding, in contrast to all other findings under the Act would require a standard beyond clear and convincing.

## III.

We now turn to J.M.B. and the incidents that led to his eight convictions.

---

[1] To the extent that *In re Civil Commitment of J.P., supra,* 393 *N.J.Super.* at 18, 922 *A.2d* 754, suggests that the lesser standard of "substantial evidence" is sufficient, it is disapproved.

A.

### 1. R.J. (April 17, 1977)

J.M.B.'s signed statements made to the police provide details about the circumstances of this incident. In that statement J.M.B. admitted that he "picked up" ten-year-old R.J., drove him to a wooded area, and attempted to tie him up. Although ultimately unsuccessful, J.M.B.'s efforts to tie up R.J. caused rope burns on R.J.'s arms. When R.J. attempted to escape by running from the area, J.M.B. caught him, carried him back to his car, and drove the boy home. J.M.B. conceded that he "might have" threatened R.J. with harm if he told anyone about the incident.

J.M.B.'s statement continued to cover events after he released R.J. After that, he stated that he picked up two other boys a few hours later and drove them to his home. He brought the boys to his bedroom, where J.M.B. tied up the hands and feet of one of the boys and then left the room. Fifteen minutes later, he untied the boy. During this incident, J.M.B. also served the boys alcohol and marijuana.

Based on these incidents, J.M.B. pleaded guilty to contributing to the delinquency of a minor, distribution of marijuana to a minor, and threatening to kill. He was sentenced to an indeterminate term at the Youth Reception and Correction Center—which was suspended—as well as to one year of probation with a special condition that required him to continue psychiatric treatment.

The evidence that J.M.B.'s conviction, in respect of his actions involving R.J. was sexual in nature came from his own statement to the police. He did not plead to a sexual offense and his one-year sentence at the Youth Reception and Correction Center was suspended because he was reported to be making "good progress with his psychiatric counseling."

### 2. E.H. (October 7, 1981)

On October 7, 1981, J.M.B. offered a ride to fifteen-year-old E.H., who was hitchhiking to school. According to E.H., J.M.B.

asked him if he wanted to "get high," and when he answered affirmatively, they drove to a wooded area. E.H. reported that, once there, J.M.B. grabbed him by the hair, threw him to the ground, held a knife to his throat, and told him to lie on his stomach. E.H. managed to run to a nearby house where the police were called. He suffered a throat wound that required five stitches.

J.M.B., on the other hand, claimed that he was giving E.H. a ride to school when E.H. directed him to the wooded area and then offered him a bag of pills. He claimed that E.H. became angry and attempted to punch him when J.M.B. informed him that he had no money. J.M.B. claimed that he swung back and that E.H. threw a rock at him.

On March 2, 1982, J.M.B. was indicted in Somerset County for second-degree aggravated assault and third-degree criminal restraint. The indictment issued in conjunction with a Middlesex County indictment based on events that took place one month later in that county and are described hereinafter.

The E.H. incident has no established connection to sexual assault beyond expert opinion, offered before the commitment court, which identified the behavior in that fashion. The commitment court did not find this conviction to involve facts that permitted the offense to be considered a sexually violent offense under subsection (b). Although J.M.B. ultimately pleaded guilty to a charge of criminal restraint for his encounter with E.H., J.M.B. did not admit to any sexual gratification from this incident and, in fact, he claimed that he was assaulted by E.H. Furthermore, even E.H. apparently attributed a monetary motivation to the assault because he offered J.M.B. decongestant tablets if he would let him go.

3. A.C. (November 8, 1981)

While J.M.B. was free on bail for the indictment involving his interaction with E.H., another young man, A.C., reported that he was kidnapped by J.M.B. on November 8, 1981. A.C., who was

sixteen-years-old at the time of the incident, told police that J.M.B. pulled his car over to the side of the road where A.C. was walking to a friend's house. He asked A.C. for directions. When A.C. leaned into the car's compartment to look at a map that J.M.B. was showing him, A.C. was knocked unconscious. He awoke to find his hands and feet tied behind him. J.M.B. was in the process of tying the ropes tighter. A.C.'s hair was taped and was tied by a rope attached to his feet. He also was blindfolded; his mouth gagged and glued shut. After a few hours, J.M.B. removed the gag and told A.C. that he would only let him go if he allowed J.M.B. to cut off his hair. A.C. agreed. J.M.B. thereupon ripped out A.C.'s hair in part and cut the remainder off with scissors. J.M.B. then cut A.C.'s ropes and drove the boy, still blindfolded, to a wooded area where he abandoned him.

The afore-cited facts were recounted to police by A.C. In a psychological evaluation later conducted for the Parole Board by a Clinical Psychologist, J.M.B. admitted that those facts were essentially correct.

The Middlesex indictment charged J.M.B. with kidnapping and aggravated assault in respect of this incident. He pleaded guilty on February 11, 1982. He also pled to a criminal restraint charge resulting from the incident with E.H.

J.M.B. received a sentence of fifteen years. Both the A.C.- and E.H.-related judgments of conviction recommended that J.M.B. serve his sentence in the Department of Corrections' Sex Offender Unit. The Middlesex County sentencing court described J.M.B.'s offenses as "depraved" and described J.M.B. as "a danger to society" who was "likely to offend again." The court expressed its dissatisfaction that the sex offenders law in effect at the time did not apply to J.M.B. and its disappointment that J.M.B. would not have "the benefit of that treatment."

Five years later, in 1986 when J.M.B. was eligible for parole, the Parole Board sent J.M.B. to the Avenel Diagnostic and Treatment Center for an assessment of the extent of his pathology and his level of risk if paroled. It was during his interview with Dr. Witt,

the State's Clinical Psychologist, that J.M.B. acknowledged his behavioral pattern of finding an adolescent male, incapacitating him, tying him up, and pulling out his hair. He denied engaging in overt sexual acts with his victims, but admitted that he found their bondage sexually arousing. The psychologist ultimately concluded that J.M.B. was at risk to commit additional offenses and that he was a poor candidate for parole.

4. F.S. (July 7, 1989)

F.S., a twenty-year-old man, informed the police that he and J.M.B. had been engaging in bondage behavior over a period of six months when a final encounter occurred on July 7, 1989. In a signed statement to the police, F.S. stated that J.M.B. drove him to J.M.B.'s house instead of to F.S.'s worksite as planned. J.M.B. then forced F.S. into the house and tied him up, including tying his hair to a rope affixed to the ceiling.

F.S. eventually collapsed when his hair loosened from the ceiling rope. After F.S. regained consciousness, J.M.B. dragged him downstairs and cut some of his hair. J.M.B. threatened to again hang F.S. from the ceiling if he refused to permit J.M.B. to cut off all of F.S.'s hair. J.M.B. then cut off the hair and drove him home.

After F.S. notified the police about this encounter, the police conducted a search of J.M.B.'s home and car. They found a stun gun, photos of teenage males performing sexual acts, bondage paraphernalia, hair fibers in baggies, and clumps of used duct tape that had hair fibers stuck to the tape. J.M.B.'s presentence investigation report states that, when arrested and interviewed at the Warren County Correctional Center, J.M.B. admitted that he handcuffed and gagged F.S., tied his hands and feet together, and tied him by his hair to the ceiling beam.

This incident lead to J.M.B.'s first, and only, charge for a "sexually violent offense" as listed in the SVPA. J.M.B. was indicted for criminal restraint, terroristic threats, possession of a weapon for unlawful purposes, kidnapping, aggravated assault and

criminal sexual contact. The State premised the criminal sexual contact charge on J.M.B.'s "attempt to commit an act of sexual contact with [F.S.] by using physical force or coercion for the purpose of sexually arousing or sexually gratifying himself and/or to degrade or humiliate [F.S.]." [2]

On January 10, 1991, J.M.B. pleaded guilty to criminal restraint, terroristic threats and possession of a weapon for unlawful purposes. All other charges were dismissed. J.M.B. was sentenced to a term of seven years, with a two-and-one-half year period of parole ineligibility.

### 5. S.S. (July 1995)

The following recitation concerning this incident is based on a statement that the victim, S.S. gave to the police.[3] After J.M.B. was released from prison, he met fifteen-year-old S.S., who was on furlough from the Ranch Hope Program, a program for troubled youth. S.S. told J.M.B. that he was unhappy at Ranch Hope. J.M.B. encouraged S.S. to run away. While away from the program during another furlough period, S.S. snuck out of his home to avoid being returned to Ranch Hope. He called J.M.B. asking to be picked up. J.M.B. complied and took S.S. to his residence in Pennsylvania.

J.M.B. repeatedly provided S.S. with money in exchange for the chance to tie him up. On one occasion, J.M.B. touched S.S.'s penis but he stopped when told to do so by S.S. According to S.S., each time J.M.B. would tie him up, J.M.B. would sit in front of him and watch him try to remove the bindings. S.S. also told the police

---

[2] We note that the only mention in this record of J.M.B. touching F.S.'s private parts is found in the Clinical Psychiatric Assessment that was conducted in February 2004. The psychiatrist's report includes a statement that F.S. made to the police describing how "sometimes [J.M.B.] used to try to touch [F.S.'s] private parts." That statement by F.S. is not itself present in the record before us nor can we find mention of this allegation in the presentence investigation report.

[3] J.M.B. never acknowledged the veracity of S.S.'s statement.

that J.M.B. would play a male bondage video on the television while he watched as S.S. attempted to release himself from the restraints. S.S. also stated that J.M.B. threatened him if he said anything to anyone.

J.M.B. was indicted for interference with the custody of a committed person. In February 1996, he pleaded guilty and was sentenced to five years of probation. His probation was revoked on June 25, 1999 for his failure to remain arrest-free.

### 6. W.S. (April 3, 1997)

On April 3, 1997, J.M.B. was arrested and charged with harassing nineteen-year-old W.S. W.S. told the police that he had known J.M.B. for approximately three weeks when he went to the room that J.M.B. was renting at the time. According to W.S., he was to be "initiated."

W.S. sat in a chair while J.M.B. tied him up and put duct tape over his eyes. W.S. asked J.M.B. to stop when he attempted to stuff a wet rag in W.S.'s mouth. J.M.B. ignored W.S. and taped the rag over his mouth and guided him to J.M.B.'s bed. With his hands and feet still bound, W.S. was able to remove the tape from his eyes and mouth. He demanded to be untied and J.M.B. complied. Claiming that he needed to use the restroom, W.S. left the house. J.M.B. followed W.S. down the street in his car until W.S. finally agreed to enter the car. J.M.B. then drove him home. When W.S. told his mother about the incident, she contacted the police. W.S.'s statement to the police described the incident as above, adding, further, that at no time did J.M.B. touch him sexually.

When questioned by the police, J.M.B. agreed with W.S.'s account, except to claim that W.S. was compliant, even when the rag was put in his mouth. J.M.B. was charged with harassment. The charge was downgraded in municipal court to a violation of the local loitering ordinance. J.M.B. pleaded guilty and was fined.

7. Illegal Handcuffs (September 9, 1997)

On September 9, 1997, J.M.B.'s car was stopped for a motor vehicle violation. The officer observed a pair of handcuffs in plain view in the car. J.M.B. was arrested and his car searched. The police found chains, a rope with a "hangman's knot," several pairs of thumb cuffs, Vaseline, wire cutters, duct tape, belts used for bondage, and other similar items.

J.M.B. was charged with illegal possession of handcuffs, driving with a suspended license, driving an uninsured vehicle, improper window tinting, and improper vehicle emissions. He pleaded guilty to the possession of handcuffs charge, and was fined.

8. A.V., J.R. (April 7, 1999)

During a search of the trunk of J.M.B.'s car when he was stopped on an outstanding traffic warrant and for driving with an expired license, police found one hundred photographs depicting young men who were bound and gagged. The young men were arranged in poses. Some were blindfolded. Several photographs had locks of hair taped to them. At least two of the photographs depicted what appeared to be an erect penis in close proximity to the young men's faces.

After being given *Miranda*[4] warnings, J.M.B. waived his rights and provided a statement to the police. He admitted that he took the photographs. He claimed that all the young men in the photographs were willing participants in the activities pictured in the photos. J.M.B. further stated that, after he took the photographs, he would go to his bedroom and masturbate while reading books involving bondage. He admitted that his bondage activities were "sex related," however, he denied any "sex involvement" with his photo participants because he said that he did not have sex with the young men. J.M.B. also said that the "penis" depicted in

---

[4] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

the photographs was not real,[5] and claimed the blindfolded subjects were unaware of the device's presence.

J.M.B. gave the police the names of some of the young men in the photographs. The police thereafter met with fourteen-year-old A.V. In a signed statement to the police, A.V. said that he had agreed to be tied up by J.M.B. in exchange for satisfaction of a ten dollar debt he owed to J.M.B. J.M.B. tied up A.V. in his trailer and blindfolded him. A.V.'s friend, who was outside, eventually called the police.

The police also spoke to two friends of A.V.—D.F. and T.D.—who informed the police that J.M.B. had tied them up also.

J.M.B. was charged with three counts of harassment, one count of contempt, and three counts of luring and enticing a child. He was released on bail on the condition that he have no contact with the victims. J.M.B., however, already had telephoned one of the boys from jail (J.R.) and he proceeded to call him several more times after being released. J.M.B. also wrote to J.R. J.M.B. was arrested again and charged with tampering with a witness.

Thereafter, in October, 2001, the photographs that had been seized by the police were ordered suppressed because they had been seized without a warrant. Because the photographs had provided the State with its key evidence and that evidence now was suppressed, only the witness tampering charge against J.M.B. remained viable. The three counts of harassment and the three counts of luring and enticing a child were dismissed. J.M.B. pleaded guilty to tampering with a witness.[6] He was sentenced to five years imprisonment.

J.M.B. was scheduled to be released from prison on that sentence on or about February 4, 2004 when, on January 22, 2004, the Attorney General filed the petition for his civil commitment. Because the SVPA proceeding is civil in nature, the civil commit-

---

[5] J.M.B. claimed that it actually was a phallus-shaped sexual device.

[6] A related contempt charge also was dismissed.

ment court held that the exclusionary rule, which barred use of the photographs as evidence in the State's criminal case against J.M.B., would not apply in the civil commitment hearing. Therefore, the court held that the photographs could be used in the civil commitment hearing. The photographs were presented by the State and considered by the court.

### B.

At J.M.B.'s commitment hearing, the State presented three experts. Dr. Luis Zeiguer, Dr. Rusty Reeves, and Dr. Benjamin L. Liberatore. No other witnesses testified.

Dr. Zeiguer's testimony was based on the report that he prepared following a sixty-minute interview with J.M.B. in February, 2004. J.M.B. declined a follow-up interview. In order to prepare his report and conclusions, Dr. Zeiguer explained that he used independent sources commonly relied upon by psychiatrists for purposes of an evaluation, including: victim's statements, presentence reports, investigation reports, and prior forensic psychological and psychiatric assessments.

Dr. Zeiguer opined that J.M.B.'s prior convictions were sexual crimes because J.M.B.'s "sexual sadism" was done with "nonconsensual partners." The young men qualified as victims according to Dr. Zeiguer because they did not explicitly consent to the extent of J.M.B.'s conduct and/or were not of a legal age to give consent. He also explained that J.M.B. gave the young men alcohol and marijuana, which was a "grooming behavior" to "dampen their inhibitions."

When discussing the 1977 incident with R.J., Dr. Zeiguer testified that J.M.B. was

sexually turned on by having a total control o[ve]r the muscular voluntary system of his involuntary sexual partner. [T]his element persisted all through his offenses and we see that the [ ] voluntary system of the partner has to be paralyzed by him. The partner has to be awake but has to have no control over his own muscular system. [T]he muscular system becomes an erotic element for sexual sadism, the voluntary muscular system has a very special quality.

Dr. Zeiguer pointed to the fact that the offenses with E.H. and A.C. took place within two months of each other, which showed that J.M.B.'s urge was so strong that he took risks and used cunning in his methods of access to victims. Also, according to Dr. Zeiguer, the fact that J.M.B.'s July 1989 offense was committed while he was still on parole for his two 1981 offenses showed "that he cannot be deterred," that "he does not learn from experience." In sum, Dr. Zeiguer said that, to J.M.B., the bondage activity "is so important, this need for him is so overpowering that he's willing to put at stake his freedom."

Dr. Zeiguer opined that J.M.B., was affected by sexual sadism and personality disorder N.O.S. (not otherwise specified) with antisocial features. Dr. Zeiguer explained sexual sadism as "a recurrent behavior where non-consenting partners are subjected to painful or humiliating or scary or terrifying experiences." He further opined that because J.M.B. has suffered from this same disorder since he was twelve years old, "the diagnosis ... is extremely, extremely severe." In respect of the personality disorder, Dr. Zeiguer concluded that J.M.B. is callous and shallow, and lacks empathy for others, as evidenced by his persistent violation of other people's rights. He also described J.M.B. as impulsive, pointing to the fact that, despite his record, J.M.B. drove around, once without a license and once without insurance stickers, "in vehicles that contain[ed] an arsenal of bondage equipment."

Dr. Zeiguer called J.M.B.'s combination of disorders especially formidable

> [b]ecause you have a very, very powerful paraphilia [that] appears to be monopolizing his life and then you have a personality disorder where to violate other people's rights would not take much.

In Dr. Zeiguer's opinion, J.M.B. cannot be deterred. He pointed to the number of offenses in which J.M.B. was involved and the fact that J.M.B.'s behavior did not alter after being placed on probation or parole. Accordingly, he concluded that J.M.B. posed an "enormous" risk to re-offend in the foreseeable future unless he is confined to a secure facility for treatment.

Dr. Reeves also testified for the State. His testimony was based on the report that he had prepared following his January, 2004 forensic psychiatric evaluation of J.M.B. In preparing that report, Dr. Reeves stated that he relied upon source material commonly used in his profession: police investigation reports, presentence reports, and prior psychological evaluations. He explained that the use of such materials is necessary because a person participating in a forensic psychiatric evaluation "typically has a great motivation to lie or distort facts." Dr. Reeves stated that he also relied on statements that J.M.B. made to previous evaluators, explaining that because those statements were made before the enactment of the SVPA in 1998, J.M.B. had much less reason than he does now to "distort his arousals and his behaviors."

Dr. Reeves described J.M.B.'s behavior as demonstrating "sexual arousal to bondage, and more broadly, sexual sadism." He considered J.M.B.'s prior offenses to be sexual offenses "[b]ecause they involved the non-consensual bondage and humiliation of [J.M.B.]'s victims" and because "this bondage was done for [J.M.B.]'s sexual arousal."

Like Dr. Zeiguer, Dr. Reeves also found it significant that many of the offenses for which J.M.B. was convicted occurred while he was on parole for a prior offense, explaining that,

it's been shown in the literature on sexual recidivism and for that matter offenses in general that a person's risk of future offenses is increased if that person reoffends while on some form of judicial supervision. And [J.M.B.] has re-offended on more than one occasion while under supervision.

He also found it significant that J.M.B. petitioned the court for the return of the photographs that he had taken of the young men. Dr. Reeves described this as

further evidence of just how entrenched [J.M.B.] is in his paraphilia and his sexual sadism ... he's under scrutiny as being a sexually violent predator and now he's petitioning to have ... these [photographs with] locks of hair returned to him which are elements of those same offenses. It shows incredibly poor judgment if one is trying to avoid being detained, but that's [J.M.B.], nothing stopped him in the past.

Dr. Reeves further testified that he considered some of J.M.B.'s bondage practices to be "extremely dangerous." In particular, he discussed the incident during which J.M.B. duct-taped a young man's eyes and mouth shut, making it difficult for the young man to breath or "communicate his distress" to J.M.B.

Like Dr. Zeiguer, Dr. Reeves also considered J.M.B.'s "grooming" behavior to be significant. According to Dr. Reeves, J.M.B. was likely to continue to commit these types of offenses because this conduct was J.M.B.'s "nearly exclusive sexual outlet." When asked whether bondage is "innately" sexual, Dr. Reeves replied in the affirmative. Dr. Reeves noted that J.M.B. "denied that he had ever committed an actual sex offense," and "claimed that the persons consented to the bondage and that the motivation for his behavior was not sexual." However, that led to Dr. Reeves's conclusion that J.M.B. was not telling the truth and that he lacked any remorse for his offenses.

Dr. Reeves's diagnosis of J.M.B. mirrored Dr. Zeiguer's: sexual sadism and antisocial personality disorder. Citing the definition of sexual sadism contained in the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM–IV), Dr. Reeves concluded that J.M.B. met the definition because of the "consistency and persistency of his acts"; the fact that he is "sexually excited by the total control he has over his bound victims"; and the fact that he is "sexually excited by the humiliation his victims endure when he for example cuts their hair and causes them fear or threatens them or goes beyond their consent." Concerning J.M.B.'s antisocial personality disorder, Dr. Reeves testified that J.M.B. "shows in general a pervasive disregard for the rights of others" as well as "impulsivity, failure to plan ahead, irritability and aggressiveness, disregard for the safety of others, consistent irresponsibility and lack of remorse."

As did Dr. Zeiguer, Dr. Reeves opined that J.M.B.'s combined diagnosis of sexual sadism and antisocial personality disorder makes him very likely to recidivate because "you're combining a person who generally doesn't care about offending the rights of

others with a person who is explicitly aroused by proscribed sexual behaviors." Dr. Reeves concluded that J.M.B. will have "serious difficulty in controlling his offending behaviors."

The third expert witness to testify for the State was Dr. Liberatore, a clinical psychiatrist who testified about his May, 2002 psychological risk assessment of J.M.B., which was performed at the request of the release committee of the State Parole Board. Dr. Liberatore testified that he determined J.M.B.'s prior offenses to be, in fact, sex offenses because J.M.B.'s actions were taken in furtherance of his sexual gratification. Dr. Liberatore stated that J.M.B. admitted to having recurring sadomasochistic fantasies involving young males between the ages of fifteen and twenty-two and to being sexually gratified by his bondage interactions with individuals. J.M.B. also told Dr. Liberatore that he had consensual sexual relations with one of the individuals and, further, that "there may have been sexual contact" with S.S., the fifteen-year-old who J.M.B. helped escape from Ranch Hope.

Dr. Liberatore opined that, by repeating similar offenses soon after his release from prison, J.M.B. displayed a repetitive, compulsive, deviant and often violent pattern of sexual arousal behaviors "that he is likely to act on ... again." He testified that J.M.B. expressed no remorse or empathy towards his victims and did not consider his actions to be problematic. J.M.B. also told Dr. Liberatore that he was likely to continue such behaviors after he was released from prison. Lastly, Dr. Liberatore testified that J.M.B. scored high on the MnSOST–R and Static–99, actuarial tests used for assessing the recidivism rate of sexually violent predators. Dr. Liberatore diagnosed J.M.B. with sexual sadism of adults and children.

## C.

In finding J.M.B. subject to civil commitment, the trial court made specific findings that four of J.M.B.'s offenses "should be considered sexually violent" under *N.J.S.A.* 30:4–27.26(b)'s definition.

The court turned first to the details of J.M.B.'s first offense, in 1977, involving R.J., for which he pleaded guilty to threatening to kill and contributing to the delinquency of a minor. Based on "[t]he plea, the statement by [J.M.B.], the ages of the children, the grooming behavior, that is the use of alcohol and drugs, the child crying, the rope burns, the acknowledgments that [J.M.B.] derived sexual pleasure from these crimes, [and] the repeated acts over the course of a week," the trial court found that the offense should be considered a sexual offense under the SVPA.

The trial court also found that J.M.B.'s third offense, involving A.C., which took place only a month after the offense involving E.H., should be considered a sexual offense. J.M.B. pleaded guilty to kidnapping and aggravated assault for the incident. In so holding, the commitment court placed significant emphasis on the fact that J.M.B. admitted to Dr. Witt that the commission of these offenses sexually aroused him. The court also found it "highly persuasive" that the sentencing court recommended that J.M.B. serve his time for this offense at the Sex Offenders Unit based on the information that the sentencing court had before it. Finally, the court relied on the victim's statement, which it found was substantially corroborated by the fruits of the police officers' valid searches of J.M.B.'s home, his vehicle, and the crime scene. Moreover, J.M.B. admitted, when being evaluated by the State's Clinical Psychologist for the Parole Board, that A.C.'s version of what transpired was essentially correct.

Next, the trial court found that J.M.B.'s conviction for criminal restraint, terroristic threats and possession of a weapon for the incident involving F.S., in 1989, should also be considered a sexual offense. The trial court based this determination on "the nature of the acts," the fact that J.M.B. admits to "tying up young men for sexual pleasure," J.M.B.'s claim that a therapist in prison told him to find consenting bondage partners, and J.M.B.'s statement at sentencing that his actions were "really sick and morbid." Finally, the court also relied on Dr. Reeves's and Dr. Zeiguer's expert testimony that these bondage activities are J.M.B.'s "nearly

exclusive sexual outlet" and "that hair cutting is an element of sexual sadism." The court took special note of the fact that, in making those observations, the experts made specific reference to this particular offense.

Finally, the trial court concluded that J.M.B.'s conviction for interfering with the custody of a committed person, which arose from his involvement with S.S. in 1994 and 1995, should also be considered a sexual offense. The trial court based this finding on the number of times J.M.B. bound S.S.; S.S.'s claim that J.M.B. touched his penis; the fact that J.M.B. took a picture of S.S.'s naked buttocks; S.S.'s statement that J.M.B. watched bondage videos while also observing S.S. attempt to untie himself; that S.S. was an "emotionally fragile person;" that S.S. was only fifteen and, therefore, unable to give consent; that S.S. described the bondage encounters as frightening; that J.M.B. was grooming S.S. by giving him money; J.M.B.'s admission to Dr. Liberatore, and to other experts, that he obtained sexual gratification from this type of bondage activity; and finally, on the fact that J.M.B. "portray[ed] himself as a do-gooder who trie[d] to help poor unfortunate boys," which, the court found, showed that J.M.B. "has no insight whatsoever into his behavior."

The trial court found insufficient evidence to conclude that J.M.B.'s offenses involving E.H. and J.R. should be considered sexually violent offenses.

### D.

As noted, the Appellate Division affirmed the trial court's determination that J.M.B. qualified for civil commitment under the SVPA. *In re Commitment of J.M.B.*, 395 *N.J.Super.* 69, 928 *A.*2d 102 (App.Div.2007). The panel agreed that J.M.B.'s underlying offenses should be considered sexually violent offenses. The court reasoned that J.M.B.'s "convictions for threats to kill, kidnapping, aggravated assault, criminal restraint, and terroristic threats are clearly violent offenses." *Id.* at 91, 928 *A.*2d 102. The panel found that "the facts and circumstances surrounding all of

[J.M.B.'s] convictions contain elements of violence and speak loudly of sexual compulsion. Binding, gagging, and blindfolding these young males was intended to humiliate them for J.M.B.'s sexual gratification." *Ibid.* The court concluded,

the use of force, coercion, threats of physical harm, lack of knowing consent, exploitation of underage victims, and grooming them with drugs or alcohol to satisfy J.M.B.'s compulsive sexual gratification presents sufficient circumstances for [the trial court's] finding that J.M.B.'s offenses were "sexually violent offenses" under subsection (b) Of *N.J.S.A.* 30:4-27.26.

[*Id.* at 92, 928 *A*.2d 102.]

In so holding, the Appellate Division rejected J.M.B.'s hearsay arguments. *Id.* at 93–97, 928 *A*.2d 102. It held that the commitment court could rely on police reports, presentence reports and prior psychiatric evaluations, "both to consider the circumstances of the offenses to determine whether J.M.B. committed a 'sexually violent offense' within the meaning of *N.J.S.A.* 30:4-27.26(b), and to evaluate the opinions of the testifying experts who considered these documents in reaching their diagnoses." *Id.* at 93, 928 *A*.2d 102. The panel further found that the trial court did not err in admitting the photographs seized from J.M.B.'s car because the exclusionary rule does not apply in civil proceedings. *Id.* at 95, 928 *A*.2d 102. And, finally, the court held that the State's experts could consider the police reports as relevant background information when forming their expert opinions. *Id.* at 94–95, 928 *A*.2d 102 (citing *N.J.R.E.* 803(c)(6); *In re Commitment of A.X.D.*, 370 *N.J.Super.* 198, 201, 851 *A*.2d 37 (App.Div.2004); *In re Commitment of J.H.M.*, 367 *N.J.Super.* 599, 613, 845 *A*.2d 139 (App.Div. 2003), *certif. denied*, 179 *N.J.* 312, 845 *A*.2d 137 (2004)).[7]

Before this Court, the parties advance essentially the same arguments as those presented to the Appellate Division.

---

[7] The Appellate Division rejected J.M.B.'s contention that the trial court used his prior evaluations in an improper manner in reaching its findings. *Id.* at 96, 928 *A*.2d 102. The panel also held that the SVPA did not violate constitutional guarantees against double jeopardy and ex post facto laws. *Id.* at 97, 928 *A*.2d 102. J.M.B.'s assertion that the SVPA is unconstitutionally vague also was rejected. *Id.* at 98, 928 *A*.2d 102.

## IV.

Based on our interpretation of subsection (b)'s standard for a finding of a sexually violent offense, namely that it requires substantially equivalent conduct to the conduct captured by the offenses listed in subsection (a), *see supra* at 576–79, 964 *A.*2d at 760–62, we have no difficulty concluding that J.M.B.'s offense in respect of A.C. meets that definition. Based on that offense, and that offense alone, we can affirm the judgment of the Appellate Division, which affirmed the order of civil commitment entered against J.M.B. by the commitment court. In addition to the fact that J.M.B.'s conduct during the incident with A.C. shared many characteristics and elements of the subsection (a) offense of kidnapping, the evidence of the violent and sexual nature of J.M.B.'s conduct towards A.C. also was overwhelming.

Although many of the offenses listed in subsection (a) require "touching or penetrating private parts of the body usually associated with sex offenses," as argued by J.M.B., not all of them do. Aggravated sexual assault, sexual assault, criminal sexual contact, and aggravated criminal sexual contact do require either "sexual penetration" or "sexual contact." *See N.J.S.A.* 2C:14–2, *N.J.S.A.* 2C:14–3(a), (b). Likewise, for felony murder to constitute a subsection (a) offense, the underlying crime must be sexual assault, *N.J.S.A.* 2C:11–3(a)(3), which, again, requires "sexual penetration" or "sexual contact." However, under subsection (a), *kidnapping* does not necessarily require "touching or penetrating private parts of the body usually associated with sex offenses." If the victim is less than sixteen years old, kidnapping constitutes a subsection (a) offense when the victim is subjected to, or permitted to engage in, a "prohibited sexual act." [8] *See N.J.S.A.* 2C:13–

---

[8] *N.J.S.A.* 2C:24–4(b)(1) defines "Prohibited sexual act" as

 (a) Sexual intercourse; or

 (b) Anal intercourse; or

 (c) Masturbation; or

 (d) Bestiality; or

 (e) Sadism; or

1(c)(2)(b) (defining circumstances under which kidnapping constitutes crime of first degree). "Sadism" is one of the "prohibited sexual acts" that renders kidnapping of a minor a subsection (a) offense. *See N.J.S.A.* 2C:13–1(c)(2)(b), *N.J.S.A.* 2C:24–4(b)(1)(e). Webster's Dictionary defines "sadism" as the "derivation of sexual satisfaction from infliction of pain on others." *Webster's II New College Dictionary* 997 (3d ed.2005). Similarly, Dr. Reeves testified that the DSM–IV defines "sexual sadism" as "persistent intense sexually arousing fantasies, urges or behaviors involving real acts in which the psychological or physical suffering including the humiliation of the victim is sexually exciting to a person. And these urges, fantasies and behaviors cause distress or impairment."

J.M.B. admitted that he knocked A.C. unconscious; kidnapped him; took A.C. back to his house; blindfolded him; tied his hands and feet together; taped his hair and tied it to his feet; gagged and glued A.C.'s mouth shut; and ripped and cut out A.C.'s hair. The conduct to which J.M.B. subjected A.C. was some of J.M.B.'s most violent. Likewise, the sexual nature of J.M.B.'s actions with A.C. is undeniable. J.M.B., described his bondage activities as "sex related." He admitted to the police, and to his doctors, that he received sexual gratification from his bondage activities. All three State's experts testified, in detail, as to the sexual nature of J.M.B.'s bondage activities.

Finally, it is significant that, when sentencing J.M.B. for his offenses concerning A.C., the sentencing court recommended that J.M.B. serve his time at the Sex Offenders Unit. Clearly, J.M.B. was "apprised with a reasonable degree of certainty," *State v. Lee,* 96 *N.J.* 156, 166, 475 *A.2d* 31 (1984), that the

---

(f) Masochism; or

(g) Fellatio; or

(h) Cunnilingus;

(i) Nudity, if depicted for the purpose of sexual stimulation or gratification of any person who may view such depiction; or

(j) Any act of sexual penetration or sexual contact as defined in N.J.S. 2C:14–1.

conduct to which he subjected A.C. was regarded as sexually violent by any reasonable standard. We conclude therefore that the record in this matter, as it pertains solely to the offense involving A.C., provided adequate support for the civil commitment court's finding that J.M.B. had been convicted of a subsection (b) predicate crime for a sexually violent offense, based on the substantially equivalent conduct standard articulated herein. We so conclude notwithstanding that A.C. was, at the time of the offense, a few months older than the required cut-off age of sixteen, which would have otherwise made his offense an exact fit with an offense listed in subsection (a). Furthermore, because we affirm the commitment court's other findings about J.M.B.'s likelihood to recidivate, as demonstrated by this record, we find substantial, credible evidence to support the court's findings, based on the clear and convincing standard required by the SVPA.[9]

---

[9] We note that the Appellate Division affirmed the trial court's use of police reports, presentence reports and prior psychiatric evaluations, "both to consider the circumstances of the offenses to determine whether J.M.B. committed a 'sexually violent offense' within the meaning of *N.J.S.A.* 30:4–27.26(b), and to evaluate the opinions of the testifying experts who considered these documents in reaching their diagnoses." *In re Commitment of J.M.B.*, *supra*, 395 *N.J.Super.* at 93, 928 *A.*2d 102. In respect of the commitment court's assessment of J.M.B.'s conduct for purposes of determining whether it constituted a sexually violent offense substantially equivalent to the conduct encompassed in subsection (a)'s listed offenses, we agree that the court could use J.M.B.'s statements as properly admitted statements of a party. *See id.* at 94, 928 *A.*2d 102 (citing *N.J.R.E.* 803(b)(1); *In re Commitment of M.L.V.*, 388 *N.J.Super.* 454, 469, 909 *A.*2d 286 (App.Div.2006), *certif. denied*, 190 *N.J.* 255, 919 *A.*2d 848 (2007)). Because J.M.B. acknowledged that A.C.'s statement was accurate, A.C.'s statement also was admissible as an adoptive admission. *See N.J.R.E.* 803(b)(2).

However, when a person's commitment is premised on conduct involving prior convictions that are not specifically listed by the Legislature as presumptive predicate offenses, the commitment proceedings take on special significance. The civil commitment court's findings must be based on solid evidence that the person's conduct in the circumstances underlying his conviction clearly and convincingly establishes sexually violent behavior. In this matter, and in respect of J.M.B.'s convictions concerning the incident involving A.C., that standard was met. The conviction was demonstrated to be based on conduct and circum-

## V.

 Before closing, we note that J.M.B. advanced before this Court, as he did below, several constitutional claims. Those issues merit attention for, consistently, when addressing application of the SVPA, we have emphasized that "[c]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'" *In re Commitment of W.Z.*, supra, 173 *N.J.* at 125, 801 *A.*2d 205 (quoting *Addington v. Texas*, 441 *U.S.* 418, 425, 99 *S.Ct.* 1804, 1809, 60 *L.Ed.*2d 323, 330–31 (1979)). Although the State's police power and its *parens patriae* power to protect and care for its citizens permit involuntary civil commitment in certain situations, those interests must be balanced against "an individual's interest in his or her liberty." *Ibid.* The State's actions are at all times "bounded by constitutional procedural guarantees." *Id.* at 125–26, 801 *A.*2d 205.

### A.

 First, J.M.B. advanced a claim that the definition of a sexually violent offense contained in subsection (b) rendered the

---

stances that, but for A.C. being a few months over the age of sixteen, clearly would have been a subsection (a) predicate offense based on J.M.B.'s own statements to the police, to doctors, and in connection with his plea and sentencing for his kidnapping conviction.

In respect of the commitment court's findings about J.M.B.'s current mental condition and whether he had a demonstrated inability to adequately control his sexually harmful conduct, we likewise affirm the trial court's reliance on the experts' opinions, which were based on a broad array of evidence about J.M.B. We specifically endorse the Appellate Division's holding that the mental health experts could use presentence reports because "they are the type of evidence reasonably relied on by psychiatrists in formulating an opinion as to an individual's mental condition." *In re Commitment of J.M.B., supra,* 395 *N.J.Super.* at 93, 928 *A.*2d 102 (citing *In re Commitment of A.E.F.,* 377 *N.J.Super.* 473, 490–93, 873 *A.*2d 604 (App.Div.), *certif. denied,* 185 *N.J.* 393, 886 *A.*2d 663 (2005); *In re Commitment of E.S.T.,* 371 *N.J.Super.* 562, 576, 854 *A.*2d 936 (App.Div.2004); *In re Commitment of J.H.M., supra,* 367 *N.J.Super.* at 611–14, 845 *A.*2d 139). For the same reason, the experts' use of J.M.B.'s own sworn statements to police and to his doctors constituted evidence that such experts would use in the formation of their opinions of J.M.B.'s likelihood to recidivate.

SVPA unconstitutionally vague. Vague criminal statutes violate due process because they fail to warn and notify the public that certain conduct could carry "criminal or quasi-criminal" liability. *State v. Hoffman,* 149 *N.J.* 564, 581, 695 *A.*2d 236 (1997) (citing *Screws v. United States,* 325 *U.S.* 91, 101–02, 65 *S.Ct.* 1031, 1035, 89 *L.Ed.* 1495, 1503 (1945)). A statute is unconstitutionally vague if it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Karins v. Atl. City,* 152 *N.J.* 532, 541, 706 *A.*2d 706 (1998) (quoting *Connally v. Gen. Constr. Co.,* 269 *U.S.* 385, 391, 46 *S.Ct.* 126, 127, 70 *L.Ed.* 322, 328 (1926)).

 The SVPA, however, is not a penal statute. *See Bellamy, supra,* 178 *N.J.* at 138, 835 *A.*2d 1231 (finding "commitment under the Act is neither penal nor direct"). Nevertheless, the SVPA has been called "almost pseudo-criminal in nature" because of "its very real threat of lengthy incarceration." *E.S.T., supra,* 371 *N.J.Super.* at 574 n. 5, 854 *A.*2d 936. Thus, despite the fact that the SVPA is "technically civil," *ibid.,* a vagueness challenge deserves careful consideration. We similarly have held that "fundamental fairness demands" that trial courts inform criminal defendants of the possible consequence of pleading guilty to a predicate SVPA offense. *Bellamy, supra,* 178 *N.J.* at 139–40, 835 *A.*2d 1231.

 As long as ordinary people are "apprised with a reasonable degree of certainty of that which is proscribed," a statute is not unconstitutionally vague. *State v. Lee,* 96 *N.J.* 156, 166, 475 *A.*2d 31 (1984) (quoting *State v. Joas,* 34 *N.J.* 179, 187, 168 *A.*2d 27 (1961)). There is, too, the strong presumption that statutes are constitutional, *see Hamilton Amusement Ctr. v. Verniero,* 156 *N.J.* 254, 285, 716 *A.*2d 1137 (1998) (citing *Harvey v. Bd. of Chosen Freeholders,* 30 *N.J.* 381, 388, 153 *A.*2d 10 (1959)).

Here, our narrow interpretation of subsection (b)'s reach defeats J.M.B.'s claim that the provision's definition of a sexually violent offense is unconstitutionally vague. Read in conjunction with subsection (a)'s definition of a sexually violent offense, subsection (b) is an understandable and definitionally precise part of a

workable standard. According to the State, the offenses under subsection (a) share common characteristics of "force, coercion, the perpetrator's sexual gratification, victimization, placing victim in fear, physical and mental suffering, threats, grooming, luring victims with money, alcohol or drugs, and offending against victims who either cannot or will not consent to the behavior." Certainly, J.M.B.'s conduct leading to his convictions for the kidnapping and aggravated assault of A.C. shared characteristics of the offense of kidnapping specifically listed in subsection (a). J.M.B. cannot convincingly claim that he lacked notice that he was vulnerable to the SVPA's consequences when he had a past conviction for substantially the same conduct as would constitute a crime defined by the Legislature as a sexually violent offense under subsection (a).[10] In sum, we conclude that J.M.B. had notice that his conduct might result in commitment under the SVPA.

## B.

J.M.B. further contends that the commitment court's subsection (b) findings so extended the scope of involuntary commitment under the SVPA that the statute must be considered punitive and, therefore, violative of the constitutional guarantees against ex post facto laws and double jeopardy. He relies on Justice Kennedy's concurrence in *Kansas v. Hendricks*, 521 *U.S.* 346, 371–73, 117 *S.Ct.* 2072, 2087, 138 *L.Ed.2d* 501, 521–22 (1997) (Kennedy, J., concurring), to argue that the SVPA must have "definitional precision" to maintain its civil nature. J.M.B. maintains that application of subsection (b) to his prior offenses destroys the statute's "definitional precision," rendering it a mere " 'mechanism for retribution or general deterrence.' " (quoting

---

[10] It bears noting, as the State points out, that the record at the commitment hearing demonstrated that J.M.B. was on specific notice that his bondage activities were sexual in nature. In 1981, a prison therapist told him as much and advised him against ever engaging in such behavior with a non-consenting partner.

*Hendricks, supra,* 521 *U.S.* at 373, 117 *S.Ct.* at 2087, 138 *L.Ed.*2d at 522 (Kennedy, J., concurring)).

This Court, in *W.Z., supra,* 173 *N.J.* at 133–34, 801 *A.*2d 205, already has upheld the SVPA against a general claim that it was unconstitutional based on ex post facto and double jeopardy considerations. In *Bellamy, supra,* 178 *N.J.* at 138, 835 *A.*2d 1231, we underscored our view that the SVPA is remedial and not punitive. Moreover, in upholding Megan's Law against constitutional objections, this Court implicitly held that remedial, nonpunitive statutes do not constitute ex post facto or double jeopardy violations. *Doe v. Poritz,* 142 *N.J.* 1, 27, 42 n. 10, 46, 52 n. 12, 662 *A.*2d 367 (1995). All that said, in response to this new and specific challenge that J.M.B. levels at the SVPA's subsection (b) definition of a sexually violent offense, we conclude that our interpretation of that definition, and its application to J.M.B.'s conduct underlying his kidnapping and aggravated assault of A.C., renders this argument without merit. As interpreted, we hold that the SVPA's definition of sexually violent offense contained in subsection (b), does not lack definitional precision and does not cause J.M.B. to suffer any ex post facto or double jeopardy violation.

## V.

The judgment of the Appellate Division is affirmed.

Justice ALBIN, dissenting.

In passing the New Jersey Sexually Violent Predator Act (SVPA), *N.J.S.A.* 30:4–27.24 to –27.38, the Legislature provided the Attorney General with a powerful tool for the protection of the public. The Legislature, however, inserted procedural safeguards in the Act to minimize the potential for its misuse. Under the SVPA, J.M.B. may be involuntarily committed as a "sexually violent predator" if there is a showing that he committed a "sexually violent offense" *and* there is a showing by clear and convincing evidence that he "suffers from a mental abnormality or personality disorder that makes [him] likely to engage in acts of

sexual violence if not confined in a secure facility for control, care and treatment." *N.J.S.A.* 30:4–27.26; *N.J.S.A.* 30:4–27.32(a).

I generally concur in the majority's measured approach in construing the reach of the SVPA. I cannot agree, however, that the Legislature intended a standard other than proof beyond a reasonable doubt to establish a sexually violent offense, which triggers the potential for life-time involuntary commitment. For that reason, I must part from the majority.

The key issue in this case is whether J.M.B. was convicted of a sexually violent offense. For purposes of this case, the SVPA provides two avenues for establishing a sexually violent offense. One avenue is for the Attorney General to show that J.M.B. was convicted of committing or attempting to commit such crimes as aggravated sexual assault, sexual assault, aggravated criminal sexual contact, certain kinds of kidnapping, and felony murder involving sexual assault. *See N.J.S.A.* 30:4–27.26(a). No one disputes that a conviction of any of those enumerated sexually violent offenses must be proven beyond a reasonable doubt.

The other avenue is for the Attorney General to establish that J.M.B. committed "any offense for which the court makes a specific finding on the record that, based on the circumstances of the case, the person's offense should be considered a sexually violent offense." *N.J.S.A.* 30:4–27.26(b). In this category, the majority essentially contends that so long as there is a conviction of an offense, beyond a reasonable doubt, then the court may make a finding by clear and convincing evidence that "the person's offense should be considered a sexually violent offense," *N.J.S.A.* 30:4–27.26(b).

I cannot conclude, particularly given the liberty interests at stake, that the Legislature has endorsed an illogical dichotomy in the burden of proof between the two statutory categories. According to the majority, in the first category, the crimes, which are clearly distinguishable as sexual offenses, must be proven beyond a reasonable doubt to trigger the SVPA. In the second category, if a person commits a crime that is not an enumerated sexual

offense, then the court is allowed to designate the offense as sexual, for purposes of the SVPA, by a showing of clear and convincing evidence. Nothing in the wording of the statute suggests that the Legislature had that asymmetrical result in mind.

The only place in the statute where the Legislature indicates that the clear and convincing evidence standard applies is where the Attorney General must show that the person, who has committed a sexually violent offense, "needs continued involuntary commitment as a sexually violent predator," *N.J.S.A.* 30:4–27.32(a). To determine that a person "needs continued involuntary commitment" necessarily requires a finding—by clear and convincing evidence—that he "suffers from a mental abnormality or personality disorder" that makes him likely to be a repeat sexually violent offender unless "confined in a secure [rehabilitative] facility." *N.J.S.A.* 30:4–27.26.

Accordingly, I believe that the Legislature must have intended that the court's "specific finding" that a non-enumerated offense is in fact a sexually violent offense be proven beyond a reasonable doubt. That is an interpretation that makes the most sense when viewing, in harmony, all the parts of the SVPA. It is also an interpretation that, I believe, would be consonant with the approach taken by the majority. Therefore, I would reverse the Appellate Division and remand this matter to the trial court to make a "specific finding" whether the Attorney General has satisfied the burden of proving "beyond a reasonable doubt" that J.M.B.'s underlying offense is a sexually violent offense under *N.J.S.A.* 30:4–27.26(b).

I therefore respectfully dissent.

Justice WALLACE joins in this opinion.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, RIVERA–SOTO and HOENS–5.

*For reversal*—Justices ALBIN and WALLACE–2.